**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| **EAST TENNESSEE GROUP,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-1072** |
| | ) | |
| **FEDERAL ENERGY REGULATORY** | ) | |
| **COMMISSION,** | ) | |
| **Respondent.** | ) | |

**PETITION FOR REVIEW**

Pursuant to Section 19(b) of the Natural Gas Act ("NGA"), 15 U.S.C. §717r(b), Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), and Circuit Rule 15, the East Tennessee Group, consisting of all of the municipal entities identified on Exhibit A (collectively "Petitioners") individually, jointly and severally, hereby petition this Court for review of the following orders issued by Respondent, Federal Energy Regulatory Commission ("Commission" or "FERC"):

1. *East Tennessee Natural Gas, LLC*, Docket No. CP23-131-000, "Order Issuing Certificate and Approving Abandonment" 186 FERC ¶ 61,210 (March 21, 2024) (attached as Exhibit B).

2. *East Tennessee Natural Gas, LLC*, Docket No. CP23-131-001, "Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration" 187 FERC ¶ 62,119 (May 20, 2024) (attached as Exhibit C).

3. *East Tennessee Natural Gas, LLC*, Docket No. CP23-131-001, "Order Addressing Arguments Raised on Rehearing" 18 FERC ¶ 61,232 (December 23, 2024) (attached as Exhibit D).

Copies of these orders are attached to this Petition. In the orders, the Commission denied the East Tennessee Group's July 18, 2024, petition for review of the Commission's *Certificate Order.* East Tennessee Group is thereby aggrieved by the Commission's actions therein and entitled to seek review before this Court.

Respectfully submitted,

*/s/ Kelly A. Daly*
Kelly A. Daly (DC Circuit Bar No. 40785)
SNELL & WILMER
2001 K. Street NW, Suite 425
Washington, DC 20006
kdaly@swlaw.com
(202) 725-0605

Date: February 19, 2025

Attorney for the East Tennessee Group

## CERTIFICATE OF SERVICE

I certify that on February 19, 2025, a copy of the foregoing Petition for Review and Exhibits, in accordance with the Federal Rules of Appellate Procedure and the Circuit Rules, has been served by electronic mail and U.S. Mail upon the Secretary of the Federal Energy Regulatory Commission, the Solicitor of the Federal Energy Regulatory Commission, the General Counsel of the Federal Energy Regulatory Commission and served on the below identified parties on the official service list compiled by FERC in Docket Nos. CP23-131-000 and CP23-131-001 below.

Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
Debbie-anne.reese@ferc.gov

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
robert.solomon@ferc.gov

David L. Morenoff, Acting General Counsel
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
david.morenoff@ferc.gov

| Party | Served On |
|---|---|
| American Forest & Paper Association | Jameson L. Calitri, Esq. DLA Piper LLP (US) 33 Arch Street, 26th Floor Boston, MA 02110-1447 |

| | |
|---|---|
| | jameson.calitri@us.dlapiper.com<br>Andrea Chambers<br>Covington & Burling LLP<br>500 8th St. NW<br>Washington, DC 20004<br>andrea.chambers@us.dlapiper.com |
| Atmos Energy Corporation | Shelly Bass<br>Associate General Counsel<br>Atmos Energy Corporation<br>PO Box 650205<br>Dallas, TX 75265<br>shelly.bass@atmosenergy.com<br><br>Trisha Young<br>Director, Gas Supply Planning<br>Atmos Energy Corporation<br>1100 Poydras Street, Suite 3400<br>New Orleans, LA 70163<br>trisha.young@atmosenergy.com<br><br>James Jeffries<br>Brian Franklin<br>McGuireWoods, LLP<br>201 N. Tryon St. Ste. 3000<br>Charlotte, NC 28202<br>jjeffries@mcguirewoods.com |
| | Brett Bell<br>PO Box 1753<br>Dandridge, TN 37725<br>brett@brettjbell.com |
| Chattanooga Gas Company | Elizabeth Wade<br>Senior Counsel<br>Southern Company Gas<br>10 Peachtree Pl. NE<br>Atlanta, GA 30309<br>ferclegal@southernco.com |

| Denham, Catherine & Scott | Scott Denham<br>scdenham@davidson.edu |
|---|---|
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Brian Heslin<br>Deputy General Counsel<br>Duke Energy Corporation<br>550 S. Tryon St. (DEC45A)<br>Charlotte, NC 28202<br>brian.heslin@duke-energy.com<br><br>Mindy McGrath<br>Mary-Kaitlin Rigney<br>Troutman Pepper Hamilton Sanders LLP<br>301 S College St. Ste. 3400<br>Charlotte, NC 28202<br>mindy.mcgrath@troutman.com<br>mary-kate.rigney@troutman.com |
| East Tennessee Natural Gas, LLC | Andrew Nakanishi<br>Estela Lozano<br>P. Martin Teague<br>Enbridge (U.S.) Inc.<br>5400 Westheimer Court<br>Houston, TX 77056<br>Andy.Nakanishi@Enbridge.com<br>estela.lozano@enbridge.com<br>marty.teague@enbridge.com<br><br>Grace O'Malley<br>Senior Counsel<br>Enbridge<br>915 N. Eldridge Pkwy.<br>Houston, TX 77079<br>grace.omalley@enbridge.com<br><br>Victoria Godfrey<br>Andrew N. Beach<br>2200 Pennsylvania Ave NW, Suite 500<br>Washington, DC 20037<br>vgodfrey@velaw.com<br>abeach@velaw.com |

| | |
|---|---|
| | Jay Seegers<br>Texas Tower<br>845 Texas Avenue, Suite 4700<br>Houston, TX 77002-6760<br>jseegers@velaw.com |
| EnerVest Energy Institutional Fund XIV-A, L.P. | Bryan Ginsburg<br>EnerVest, Ltd.<br>1001 Fannin Street, Suite 800<br>Houston, TX 77002<br>bginsburg@enervest.net<br><br>Marena Barraza<br>Enervest Operating, LLC<br>1001 Fannin Street, Suite 800<br>Houston, TX 77002<br>mbarraza@enervest.net |
| Piedmont Natural Gas Company, Inc. | Brian Heslin<br>Deputy General Counsel<br>Duke Energy Corporation<br>550 S. Tryon St. (DEC45A)<br>Charlotte, NC 28202<br>brian.heslin@duke-energy.com<br><br>Mindy McGrath<br>Mary-Kaitlin Rigney<br>Troutman Pepper Hamilton Sanders LLP<br>301 S College St. Ste. 3400<br>Charlotte, NC  28202<br>mindy.mcgrath@troutman.com<br>mary-kate.rigney@troutman.com |
| Process Gas Consumers Group | Jameson L. Calitri, Esq.<br>DLA Piper LLP (US)<br>33 Arch Street, 26th Floor<br>Boston, MA 02110-1447<br>jameson.calitri@us.dlapiper.com<br><br>Andrea Chambers |

| | |
|---|---|
| | Covington & Burling LLP<br>500 8th St. NW<br>Washington, DC 20004<br>andrea.chambers@us.dlapiper.com |
| | Stephen Strange<br>1660 Tilley Rd.<br>Talbott, TN 37877<br>stranges101@gmail.com |
| Symmetry Energy Solutions, LLC | Stacy Williams<br>Symmetry Energy Solutions, LLC<br>9811 Katy Freeway, Suite 1400<br>Houston, TX 77024<br>stacy.williams@symmetryenergy.com<br><br>Jeffrey Perryman<br>Symmetry Energy Solutions, LLC<br>1111 Louisiana St., B-241<br>Houston, TX<br>jeff.perryman@symmetryenergy.com<br><br>James Jeffries<br>Brian Franklin<br>McGuireWoods, LLP<br>201 N. Tryon St. Ste. 3000<br>Charlotte, NC 28202<br>jjeffries@mcguirewoods.com<br>bfranklin@mcguirewoods.com |
| | Sharon Williford<br>9908 Oakledge Way<br>Knoxville, TN 37931<br>sharonknoxville@att.net |

February 19, 2025                    /s/ Kelly A. Daly
                                                  Kelly A. Daly
                                                  SNELL & WILMER

Exhibit A

**ATTACHMENT**
**MUNICIPAL MEMBERS OF EAST TENNESSEE GROUP**

Athens Utilities Board
P.O. Box 689
Athens, Tennessee 37303

Bridgeport Utilities
P.O. Box 36
Bridgeport, Alabama 35740

Cookeville Gas Department 16 N.
Oak Street
P.O. Box 998
Cookeville, Tennessee 38503

Elk River Public Utility District
P.O. Box 970
Tullahoma, Tennessee 37388-0970

Etowah Utilities Gas Department
P.O. Box 927
Etowah, Tennessee 37331

Fayetteville Public Utilities
401 Main Avenue N
Fayetteville, Tennessee 37334

Gallatin Natural Gas System
239 Hancock Street
Gallatin, Tennessee 37066

Harriman Utility Board
P.O. Box 434
Harriman, Tennessee 37748

Hawkins County Gas Utility
District
202 Park Boulevard
P.O. Box 667
Rogersville, Tennessee 37857

Jamestown Gas System
P.O. Box 670
Jamestown, Tennessee 38556

Jefferson-Cocke County
Utility District
122 Highway 25E
Newport, Tennessee 37821

Knoxville Utilities Board
P.O. Box 59017
Knoxville, Tennessee 37950-9017

Lenoir City Utilities Board
P.O. Box 449
Lenoir City, Tennessee 37771

Lewisburg Gas Department
505 North Ellington Parkway
P.O. Box 1069
Lewisburg, Tennessee 37091

Livingston Gas Department
310 McHenry Circle
Livingston, Tennessee 38570

Loudon Utility Gas Department
Alma Place
P.O. Box 69
Loudon, Tennessee 37774

Madisonville Gas System
400 College Street
Madisonville, Tennessee 37354

Marion Natural Gas System
P.O. Box 408
South Pittsburg, Tennessee 37380

Middle Tennessee Natural Gas
Utility District
P.O. Box 670
Smithville, Tennessee 37166

Oak Ridge Utility District
P.O. Box 4189
Oak Ridge, Tennessee 37831-4189

Powell Clinch Utility District
P.O. Box 428
Lake City, Tennessee 37769
Rockwood Water & Gas
110 North Chamberlain Avenue
Rockwood, Tennessee 37854

Sevier County Utility District
P.O. Box 4398
Sevierville, Tennessee 37864-4398

Sweetwater Utilities Board
P.O. Box 191
Sweetwater, Tennessee 37874

Unicoi County Gas
Utility District
1414 North Main Street
P.O. Box 599
Erwin, Tennessee 37650

Exhibit B

186 FERC ¶ 61,210
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
Allison Clements and Mark C. Christie.

East Tennessee Natural Gas, LLC               Docket No.  CP23-131-000

ORDER ISSUING CERTIFICATE AND APPROVING ABANDONMENT

(Issued March 21, 2024)

1.      On March 31, 2023, East Tennessee Natural Gas, LLC (East Tennessee) filed an application pursuant to sections 7(b) and 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] requesting authorization to construct and operate the System Alignment Program Project (System Alignment Project).  The project consists of the abandonment of pipeline facilities in Washington County, Virginia, and the construction of pipeline facilities, two new compressor stations, and appurtenant equipment in Tennessee, North Carolina, and Virginia.  The System Alignment Project is designed to improve the reliability and flexibility of East Tennessee's system by minimizing the use of certain operational measures to meet existing customers' needs.  For the reasons discussed below, we grant the requested authorizations, subject to certain conditions.

## I.      **Background and Proposal**

2.      East Tennessee, a Tennessee limited liability company,[3] is a natural gas company as defined by section 2(6) of the NGA[4] engaged in the transportation of natural gas in interstate commerce.  East Tennessee owns and operates a natural gas pipeline system extending from central Tennessee through Virginia to North Carolina and south to Georgia.[5]

---

[1] 15 U.S.C. § 717f(b), (c).

[2] 18 C.F.R. pt. 157 (2023).

[3] East Tennessee is an indirect, wholly-owned subsidiary of Enbridge Inc.

[4] 15 U.S.C. § 717a(6).

[5] East Tennessee March 31, 2023, Application at 4 (Application).

3.      Nearly all System Alignment Project construction and abandonment will take place along or near East Tennessee's Line 3300-1 in Jefferson, Knox, and Sevier Counties, Tennessee; Rockingham County, North Carolina; and Patrick, Washington and Wythe Counties, Virginia.  Specifically, East Tennessee proposes to:

- construct approximately 16.1 miles of 24-inch-diameter pipeline loop on Line 3300-1 in Knox and Sevier Counties, Tennessee;

- remove approximately 6.4 miles of existing 8-inch-diameter pipeline on Line 3300-1 in Washington County, Virginia, and replace it with a new 24-inch-diameter pipeline;

- hydrostatically test approximately 1.2 miles of pipeline on Line 3600-1 in Patrick County, Virginia, to reestablish the maximum allowable operating pressure;

- construct the new Talbott Compressor Station in Jefferson County, Tennessee, consisting of one 7,000 horsepower (hp) electric motor drive (EMD) compressor unit and related appurtenances;

- construct the new Draper Compressor Station in Rockingham County, North Carolina, consisting of two 9,500 hp EMD compressor units and related appurtenances;

- install launcher and receiver facilities at the existing Topside Junction Meter and Regulator Station in Knox County, Tennessee;

- install piping modifications, launcher and receiver facilities, and other auxiliary appurtenances at the existing Boyds Creek Compressor Station in Sevier County, Tennessee;

- install piping modifications and auxiliary appurtenances at the existing Glade Spring Compressor Station in Washington County, Virginia; and

- install auxiliary appurtenances at the existing Rural Retreat Compressor Station in Wythe County, Virginia.

4.      East Tennessee states that the project is designed to improve the operational reliability of its system by minimizing the level of displacement relied upon in the system design to meet existing customers' shifting needs.[6]  It asserts that recently shippers have

---

[6] Application at 2.  East Tennessee states that displacement occurs when the transportation of gas in one direction can be met on a firm basis under the design assumption that there is a certain quantity of transportation service being nominated to

utilized the system differently than how it traditionally had been used and in contrast to
how the system was designed to work.  According to East Tennessee, these changes have
resulted in insufficient quantities being nominated on certain paths on its system, which
has challenged East Tennessee's operational ability to meet all of its firm service
obligations.[7]  East Tennessee states that absent construction of the System Alignment
Project, the operational reliability of the system will be placed at risk and customers will
be subject to an increased risk of service disruptions, including for primary firm service.[8]

5.     East Tennessee estimates that the System Alignment Project will cost
approximately $390,099,970 and requests a predetermination that it may roll in the
project costs into its existing system rates in a future NGA section 4 rate case.

## II.     **Procedural Matters**

### A.     **Public Notice, Interventions, Protests, Comments, and Answers**

6.     Notice of East Tennessee's application was published in the *Federal Register* on
April 20, 2023, with interventions, comments, and protests due May 5, 2023.[9]  Atmos
Energy Corporation (Atmos); Chattanooga Gas Company; Duke Energy Carolinas, LLC
and Duke Energy Progress, LLC; the East Tennessee Group (ETG);[10] EnerVest Energy
Institutional Fund XIV-A, L.P.; Piedmont Natural Gas Company, Inc. (Piedmont);
Symmetry Energy Solutions, LLC; Brett Bell; Scott and Catherine Denham; Vicki L.
Raybeck; Stephen and Michelle Strange; and Sharon J. Williford filed timely, unopposed
motions to intervene.[11]  On May 26, 2023, American Forest and Paper Association and

---

flow in the opposite direction.  *Id.* at 6.

    [7] East Tennessee states that it has at times had to draw down line pack and make
operational gas purchases to meet firm service obligations.  *Id.* at 7.  Line pack is the
volume of gas contained within a pipeline system.  Pipelines rely on line pack to match
the time-varying demands of their shippers and the supply of natural gas that generally
gets injected into the pipeline at a consistent rate through the day.  *Transcon. Gas Pipe
Line Co.,* 185 FERC ¶ 61,130, at P 29 n.53 (2023).

    [8] Application at 7.

    [9] 88 Fed. Reg. 24,397 (Apr. 20, 2023).

    [10] ETG is an association of 25 customers of East Tennessee engaged in the retail
distribution of natural gas.

    [11] Timely, unopposed motions to intervene are granted by operation of Rule 214 of
the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2023).

Process Gas Consumers Group filed, jointly, a late, unopposed motion to intervene, which was granted.[12]

7.     Atmos and Piedmont (jointly), ETG, Mr. Bell, Catherine and Scott Denham, and Robert and Michelle Strange filed protests.  On May 22, 2023, East Tennessee filed a motion for leave to answer and an answer to the protests.  On May 30 and June 2, 2023, ETG and Atmos and Piedmont, respectively, filed answers to East Tennessee's answer.[13] East Tennessee filed an answer to Atmos and Piedmont's answer on June 20, 2023.  Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits answers to protests and answers to answers unless otherwise ordered by the decisional authority;[14] however, we accept all the answers because they informed our decision-making process.

8.     Additionally, EPA and several individuals filed comments.  The comments and protests raise concerns regarding the need for the project; East Tennessee's request for a predetermination of rolled in rates; air quality; socioeconomic impacts; and the location of the Talbott Compressor Station.  The comments, protests, and answers are addressed in the Environmental Assessment (EA) prepared for the project and, as appropriate, below.

## B.    Request for Evidentiary Hearing

9.     ETG and Atmos and Piedmont requested an evidentiary hearing on East Tennessee's application, including its request for a predetermination that it may roll in the project costs into its existing system rates.[15]  Although our regulations provide for a hearing, neither section 7 of the NGA nor our regulations require that such a hearing be a trial-type evidentiary hearing.  When the written record provides a sufficient basis for resolving the relevant issues, it is our practice to provide for a paper hearing.[16]  That is the case here.  We have reviewed the request for a hearing and conclude that all issues of material fact relating to East Tennessee's proposal are capable of being resolved on the

---

[12] June 13, 2023, Notice Granting Late Intervention.

[13] In its answer, Atmos and Piedmont oppose East Tennessee's motion for leave to answer.

[14] 18 C.F.R. § 385.213(a)(2) (2023).

[15] ETG May 5, 2023 Protest at 4-5 (ETG Protest); Atmos and Piedmont May 5, 2023 Joint Protest at 5 (Atmos and Piedmont Protest).

[16] *See*, *e.g.*, *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) ("[the Commission] need not conduct such [an evidentiary] hearing if [the issues at hand] may be adequately resolved on the written record."); *Tenn. Gas Pipeline Co., LLC*, 158 FERC ¶ 61,110, at P 12 (2017).

basis of the written record, which contains substantial evidence on these issues. Accordingly, we will deny the request for a formal hearing.

## III.  **Discussion**

10.      Because the proposed facilities will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[17]  In addition, East Tennessee's proposed abandonment of facilities is subject to the requirements of NGA section 7(b).[18]

### A.    **Abandonment**

11.      Section 7(b) of the NGA provides that an interstate pipeline company may abandon jurisdictional facilities or services only if the Commission finds the abandonment is permitted by the present or future public convenience or necessity.[19]  In deciding whether a proposed abandonment is warranted, the Commission considers all relevant factors, but the criteria vary with the circumstances of the particular proposal.[20] Continuity and stability of existing services are the primary considerations in assessing whether the public convenience or necessity allow the abandonment.[21]  If the Commission finds that an applicant's proposed abandonment will not jeopardize continuity of existing gas transportation services, the Commission generally will find that the public convenience or necessity permits the abandonment.[22]

12.      Here, East Tennessee proposes to abandon by removal approximately 6.4 miles of existing 8-inch-diameter pipeline and replace it with a new 24-inch-diameter pipeline in order to maintain reliable service for existing shippers.  Therefore, there will be no adverse effects on service to existing shippers.  Accordingly, we find that East Tennessee's proposed abandonment is permitted by the public convenience or necessity.

---

[17] 15 U.S.C. §§ 717f (c) and (e).

[18] *Id.* § 717f(b).

[19] *Id.*

[20] *El Paso Nat. Gas Co.*, 148 FERC ¶ 61,226, at P 11 (2014) (*El Paso*).

[21] *Nat'l Fuel Gas Supply Corp.*, 160 FERC ¶ 61,050, at P 17 (2017) (*citing El Paso*, 148 FERC ¶ 61,226 at P 12).

[22] *See, e.g.*, *Tex. E. Transmission, LP*, 176 FERC ¶ 61,206, at P 11 (2021) (citing *Trunkline Gas Co.*, 145 FERC ¶ 61,108, at P 65 (2013)).

B.    **Certificate Policy Statement**

13.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[23]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  It explains that, in deciding whether and under what terms to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new project construction.

14.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

1.    **No Subsidy Requirement**

15.    As discussed above, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The Certificate Policy Statement

---

[23] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

further provides that it is not a subsidy for existing customers to pay for projects designed to replace existing capacity or improve the reliability or flexibility of existing service.[24]

### a.    Protests, Comments, and Answers

16.    Protesters argue that East Tennessee fails to provide evidence that the System Alignment Project will benefit all existing customers, making it impossible to assess whether the project is primarily designed to improve existing customers' service or to accommodate newer customers that are relying primarily on displacement.[25] ETG distinguishes between so-called "Legacy Shippers," which have steadily received gas flowing primarily from west to east on East Tennessee's system since the 1950s, and "Displacement Shippers," which utilize East Tennessee as one of various pipeline options to optimize their portfolio for the transportation of natural gas and primarily receive gas flowing from east to west.[26] According to the protesters, the Displacement Shippers' load has grown exponentially during the last several years due to East Tennessee's contracting practices.  Thus, they assert that East Tennessee has created the "reliability risks" it seeks to address with the System Alignment Project and should be responsible for the project's costs.[27] The protesters assert that otherwise the Legacy Shippers would effectively subsidize the Displacement Shippers, which will receive most of the project's benefits.[28] ETG also contends that East Tennessee is incorrect that all shippers will benefit from the system improvements simply because East Tennessee uses a "postage stamp" rate design (i.e., a rate design in which every shipper pays the same price for transportation regardless of location on the system or path).[29]

17.    Moreover, Atmos and Piedmont state that, to satisfy the no-subsidy requirement, Commission precedent requires applicants claiming their project will benefit all shippers to provide specific evidence, such as showing that the project would have prevented service interruptions.  They claim that East Tennessee fails to identify any specific

---

[24] Certificate Policy Statement, 88 FERC at 61,746 n.12.

[25] Atmos and Piedmont Protest at 7-8; ETG Protest at 9-12.

[26] ETG Protest at 10-11.

[27] *Id*. at 10-12; Atmos and Piedmont Protest at 14-15.

[28] Atmos and Piedmont Protest at 9, 11-12, n.12 (asserting that "there is no explanation or evidence of the benefit to Legacy Shippers" and that its rates, along with others shipping gas from west to east, will be increased "to fund a project from which they derive no benefit").

[29] ETG Protest at 9-10.

operational issues in the past that would have been prevented by the project.[30]  Atmos and Piedmont note that, on the contrary, neither shipper experienced service disruptions during Winter Storm Elliott, demonstrating that East Tennessee's assertions that the project is needed to reduce the risk of service interruptions are unsupported.[31]

18.    Lastly, Atmos and Piedmont argue that, even assuming west-to-east shippers will receive benefits from the project and should pay for the costs of obtaining those benefits, the Certificate Policy Statement and Commission precedent dictate that existing customers "should not bear the entire costs of a project simply because they receive some benefit from the construction of new facilities[.]"  Instead, rate increases must "relate[ ] to the improvements in service."[32]

19.    In its answer, East Tennessee states that the System Alignment Project will not create additional capacity, and thus is designed solely for the benefit of existing shippers. It asserts that, contrary to protesters' claims that only east-to-west shippers would benefit from the project, all shippers will benefit because the project will reduce displacement in both directions, enhancing system reliability.[33]  East Tennessee also disputes the protesters' description of shippers as either "legacy" or "displacement" customers, explaining that East Tennessee provides the same firm transportation service under its tariff, "including equal scheduling priority on the system, regardless of a shipper's vintage of service or direction of primary transportation path on the system."[34]

20.    Next, East Tennessee contends that the protesters misapply the no-subsidy requirement of the Certificate Policy Statement.  It states that the Certificate Policy Statement and Commission precedent demonstrate that it is not a subsidy for existing customers to pay for projects to replace existing capacity in order to improve the reliability or flexibility of existing services.[35]  East Tennessee argues that the protesters

---

[30] *Id.* at 7-8, 13-14 (citing *Transcon. Gas Pipe Line Corp. v. FERC*, 112 FERC ¶ 61,170, at 61,924 (2005), *aff'd*, 518 F.3d 916 (D.C. Cir. 2008)).

[31] *Id.* at 8-9.  ETG states that during Winter Storm Elliott "many of [its] members' systems set new highs for peak day gas usage without experiencing any major service interruptions . . .."  ETG Protest at 7.

[32] Atmos and Piedmont Protest at 13-14 (quoting Certificate Policy Statement, 90 FERC at 61,394).

[33] East Tennessee May 22, 2023 Answer at 2-6.

[34] *Id.* at 5.

[35] *Id.* at 11-12 (citing *Great Basin Gas Transmission Co.*, 182 FERC ¶ 61,088, at P 13 (2023); *Gulf S. Pipeline Co., LLC*, 181 FERC ¶ 61,145, at P 10 (2022); *N. Nat. Gas*

wrongly raise issues related to cost allocation and rate design, which should be addressed in an NGA section 4 or 5 proceeding.[36]

21.    In their answer, Atmos and Piedmont reiterate that Commission precedent requires East Tennessee to either provide specific evidence that a project benefits all shippers, such as by detailing service interruptions that the proposed project could have prevented were it operational at the time,[37] or demonstrate that the project is not tied to providing service to a specific set of customers.[38]  They argue that East Tennessee must show that the project "benefits all existing shippers equally and not just specific customers whose system utilization caused the purported need for the proposed expansion."[39]  Atmos and Piedmont aver that the cases that East Tennessee cites are distinguishable, noting that three of the cases were for projects designed to replace aging infrastructure and none of the cases address allegations that the project was intended to benefit specific customers rather than the system as a whole.[40]  Atmos and Piedmont also contend that East Tennessee wrongly relies on *Spire STL Pipeline LLC*[41] because in that proceeding the Commission issued a temporary certificate to the pipeline to prevent a service disruption to Spire's customers after the D.C. Circuit vacated the Commission's underlying authorization order.[42]

---

*Co.*, 175 FERC ¶ 61,238, at P 13 (2021); *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 15 (2021); *Tex. E. Transmission, LP*, 172 FERC ¶ 61,040, at P 9 (2020); *Tex. E. Transmission, LP*, 171 FERC ¶ 61,081, at P 12 (2020); *Tex. E. Transmission, LP*, 169 FERC ¶ 61,235, at P 10 (2019); *Columbia Gas Transmission, LLC*, 166 FERC ¶ 61,037, at P 12 (2019); *Columbia Gas Transmission, LLC*, 156 FERC ¶ 61,125, at P 15 (2016)).

[36] *Id.* at 14.

[37] Atmos & Piedmont Answer at 3-4 (citing *Transcon. Gas Pipe Line Corp. v. FERC*, 112 FERC at 61,924).

[38] *Id.* at 4 (quoting Certificate Policy Statement, 90 FERC at 61,393-94).

[39] *Id.*

[40] *Id.* at 5 (citing East Tennessee May 22, 2023, Answer at n. 18 (citing *Nat'l Fuel Gas Supply Corp.*, 162 FERC ¶ 61,239, at P 13 (2018); *N. Nat. Gas Co.*, 175 FERC ¶ 61,238 at P 13; *N. Nat. Gas Co.*, 170 FERC ¶ 61,146, at P 17 (2020))).

[41] 176 FERC ¶ 61,160 (2021) (*Spire*).

[42] Atmos & Piedmont Answer at 5.

22.    In its June 20, 2023 answer, East Tennessee argues that Atmos and Piedmont misapply the Certificate Policy Statement's no-subsidy requirement by stating that all shippers must benefit equally from a reliability project in order for the Commission to find that a project does not result in subsidization. East Tennessee asserts that the no-subsidy requirement ensures that expansion projects are needed by sending the proper price signals to the market, such that expansion shippers are willing to assume "the financial risk of the project without subsidization from existing shippers."[43]  Thus, because a "system project designed to improve existing [service] to existing shippers is not built in response to market price signals[,]" subsidization concerns do not exist for projects such as the System Alignment Project.[44]  East Tennessee contends that issues related to the cost allocation among existing shippers can only be raised in an NGA section 4 proceeding.[45]

23.    Last, East Tennessee disputes Atmos and Piedmont's characterization of the cases it cited, noting that the replacement of displacement capacity with physical capacity is analogous to replacing aging physical infrastructure.[46]  Additionally, East Tennessee explains that it cited *Spire* not for that case's facts, but for the Commission's finding that it can issue a certificate of public convenience and necessity to prevent a disruption in service to customers where there exists a risk of disruption but none has occurred.[47]

### b.    Commission Determination

24.    We reject Atmos and Piedmont's assertion that, under the Certificate Policy Statement, subsidization is determined by whether the project is "'tied to the provision of service to specific customers.'"[48]  Atmos and Piedmont omit additional context for this language. In discussing the no-subsidy policy, the Commission distinguished three types of projects: (1) expansion projects that provide additional services to new customers (including existing customers subscribing additional service); (2) projects that improve

---

[43] East Tennessee June 20, 2023, Answer at 2 (citing Certificate Policy Statement, 88 FERC at 61,746-747 (internal quotation marks omitted) (cleaned up)).

[44] *Id.* at 2-3 (internal citations and quotation marks omitted).

[45] *Id.* at 3.

[46] *Id.* at 4 (citing East Tennessee May 22, 2023 Answer at 8-9, n.21).

[47] *Id.* at n.14; *see* East Tennessee May 22, 2023 Answer at n.18 (citing *Spire*, 176 FERC ¶ 61,160 at P 10).

[48] *See* Atmos and Piedmont Answer at 4 (quoting Certificate Policy Statement, 90 FERC at 61,393-94).

the quality of existing service to existing customers by replacing existing facilities, enhancing reliability, or providing additional flexibility; and (3) combination projects that provide both new service for new customers and improvements to existing services for existing customers.[49]  The Commission explained that the no-subsidy policy "recognizes that existing customers should pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility." These types of projects are, by definition, "not tied to the provision of service to specific customers[,]" in contrast with expansion projects, which are targeted to service specific customers even though existing customers may receive "some benefit from the construction of the new facilities."[50]  Here, ETG's "Legacy Shippers" and "Displacement Shippers" are both "existing customers" for purposes of the Certificate Policy Statement. East Tennessee proposes no additional capacity and no new service will be provided as a result of the project.

25.     We also find East Tennessee's proposed cost recovery to be appropriate.  East Tennessee provides transportation service on its mainline capacity pursuant to the scheduling priorities set forth in its tariff, which does not include separate rate schedules for each flow direction.[51]  Thus, all shippers on Line 3300-1 are subject to the same postage stamp rate and terms of service.  Contrary to Atmos and Piedmont's assertion that all customers must benefit equally from the additional costs, so long as the project improves the reliability of service offered under that rate schedule, it is appropriate for all shippers utilizing the service to pay for the project, regardless of whether some shippers benefit more than others.[52]  Issues related to whether East Tennessee's postage stamp rate design continues to be just and reasonable and not unduly discriminatory are matters for an NGA section 4 or 5 rate proceeding.[53]

---

[49] Certificate Policy Statement, 90 FERC at 61,392.

[50] See id. at 61,393-94 (internal quotation marks and citations omitted).

[51] East Tennessee May 22, 2023 Answer at 5.

[52] See Tex. E. Transmission, LP, 176 FERC ¶ 61,206 at PP 23-24 (finding a pre-determination of rolled in rates is appropriate where the project provides no additional capacity and the Commission does not make a finding that the project will benefit all existing customers equally); see also E. Shore Nat. Gas Co., 156 FERC ¶ 61,053, at P 29 (2016) (same).

[53] See, e.g., Tex. E. Transmission, LP, 176 FERC ¶ 61,206 at PP 23-24 ("[O]ur determination regarding rolled-in rates does not presume any decision with regard to the appropriate allocation of project costs.  Texas Eastern will have the burden in its next NGA section 4 rate case to show that costs are assigned to services equitably and the relevant parties will be free to fully argue their positions when Texas Eastern files to roll

26.    Citing *Transcontinental Gas Pipeline Corp. v. FERC*,[54] Atmos and Piedmont allege that applicants must provide "specific evidence" that a reliability project benefits all shippers to satisfy the Commission's no-subsidy policy.[55]  In that NGA section 4 rate proceeding, Transco sought to roll the costs associated with an expansion project that had added new compressor stations to serve new shippers into its system rates and the Commission found Transco's proposed rate treatment unjust and unreasonable because it resulted in a large subsidy by existing customers of the new shippers.[56]  Affirming the Commission's determination, the court explained that the Certificate Policy Statement "announced the Commission's general goal of eliminating the subsidization of *new* customers by existing customers."[57]  Here, in contrast, the System Alignment Project involves no new shippers or capacity and is designed to benefit existing customers. Moreover, contrary to *Transco*, where the Commission rejected claims by the applicant that its project would provide generalized system benefits without showing evidence of previous service outages or that the project would "improv[e] the quality of service received by the existing shippers,"[58] East Tennessee has provided evidence that existing customers would benefit from the project.  In response to staff's August 30, 2023 data request, East Tennessee detailed examples in which it was required to use displacement to meet firm service obligations for gas flowing both directions.[59]  Further, the Commission has found that projects designed to minimize the reliance on displacement benefit customers.[60]  Thus, East Tennessee's allocation of the project costs to existing

---

project costs into its current system rates.").

[54] 112 FERC ¶ 61,170, *aff'd Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916 (*Transco*).

[55] Atmos and Piedmont Answer at 3.

[56] *Transco*, 518 F.3d at 917-19.

[57] *Id.* at 919-20 (emphasis added).

[58] *Id.* at 920 (quoting *Transcon. Pipe Line Corp.*, 112 FERC at 61,924).

[59] *See* East Tennessee Sept. 14, 2023 Data Response at 5, 7.  East Tennessee's reliance on displacement and other operational measures is further discussed below.

[60] *See*, *e.g.*, *El Paso Natural Gas Co.*, 111 FERC ¶ 61,408, at P 39 (2005) ("[A] lower reliance on displacement results in more path rights and increased segmentation opportunities, which provide benefits to pipeline customers through increased flexibility and reliability . . ..")

shippers in this section 7 proceeding reasonably reflects Commission policy and precedent.[61]

27.     Because the System Alignment Project is designed to improve system reliability and flexibility by reducing displacement on East Tennessee's system,[62] we find that the project will not result in subsidization by East Tennessee's existing shippers.

## 2.     Project Need

### a.     Protests, Comments, and Answers

28.     Protesters question the need for the project, asserting that East Tennessee fails to explain why it cannot continue using operational measures to meet its firm service obligations.[63]  They state that East Tennessee does not describe or quantify the frequency of the risk of service interruption that the pipeline is proposing to reduce with the project[64] or identify any specific past operational issues that would have been prevented by the project.[65]  ETG argues that, even assuming the risk of service interruption is on the horizon, East Tennessee does not consider other, more economical alternatives in its application[66] and that the "deference [given] to the pipeline's assessment of risk as the

---

[61] *See, e.g., Dominion Transmission, Inc.,* 129 FERC ¶ 61,048, at P 27 (2009) (explaining that under the Certificate Policy Statement the Commission has consistently found that existing shippers should be "allocated the full costs [of] replacement facilities"); *Paiute Pipeline Co.*, 104 FERC ¶ 61,078, at P 40 (2003) ("The [Certificate] Policy Statement provides that the cost of new and/or replacement facilities designed to maintain and improve existing service and enhance system reliability and flexibility for the benefit of all customers is not considered a subsidy and is therefore appropriately rolled-in to a pipeline's rates.").

[62] *See*, *e.g.*, *El Paso Natural Gas Co.*, 111 FERC ¶ 61,408 at P 39; *Nw. Pipeline Corp.*, 98 FERC ¶ 61,352, at 62,485 (2002) ("The construction of physical capacity to replace displacement capacity … will benefit existing shippers by providing more reliable and flexible access to economically priced domestic gas supplies, and … is expected to reduce the likelihood that Northwest will … need to resort to operational flow orders (OFO).".

[63] ETG Protest at 6; Atmos and Piedmont Protest at 9.

[64] ETG Protest at 5-6; *see* Atmos and Piedmont Protest at 8-9.

[65] Atmos and Piedmont Protest at 7-8, 13-14.

[66] ETG Protest at 7-8.  ETG suggests such alternatives could include enhancing existing storage capabilities, adding incremental system capacity for new contracts, or

operator of the system" must be tempered by the reality that, between the status quo and constructing the project, only the latter increases East Tennessee's rate base.[67]

29.      In its answer, East Tennessee contends that showing a risk of disruption is sufficient to find project need.[68]  It states that, contrary to the protesters' claims, the system's performance during Winter Storm Elliott demonstrates that the displacement design works when there are sufficient displacement nominations, but does not address system reliability concerns that arise when displacement nominations are lacking, particularly over a sustained period of high demand.[69]  East Tennessee asserts that ETG "concedes that other pipelines do not rely upon [operational] levers to meet firm service obligations but rather to balance their systems" and that the Commission has never "granted certificate authorization based upon a project's engineering design that incorporated the use of operational measures" where there did not exist sufficient "physical or displacement capability to ensure" firm service would always be available.[70]

30.      Additionally, East Tennessee argues that the protesters overlook that its pipeline design is predicated on certain design and engineering assumptions, not on "pipeline-initiated operational measures external to the design of the system."[71]  The project is therefore necessary to correct for "unexpected changes" by firm shippers' contract utilization that have forced East Tennessee to rely on interruptible operational measures that are not part of the system's engineering design.  As there is no guarantee such operational measures will always be available, East Tennessee states that increasing the

---

implementing tariff options that utilize non-discriminatory operational changes that prioritize the historical direction and use of firm capacity on a seasonal basis or during times of system constraint.  *Id.*

[67] *Id.* at 8.

[68] East Tennessee May 22, 2023, Answer at 7.

[69] *Id.* at 8.

[70] *Id.* at 9.  East Tennessee also states that it does not "expect that the Commission would certificate firm capacity based on a pipeline's implementation of such measures because those measures are not based on engineering or hydraulic flow design data or flow assumptions."  *Id.*

[71] *Id.* at 9-10 (citing 18 C.F.R. § 157.14(a)(8) (2023) (Exhibit G engineering flow diagram requirements)).

bidirectional physical capability of the system is a permanent solution for the reduction in displacement capability on its system.[72]

31.    Moreover, East Tennessee explains that ETG's proposed alternatives to the project[73] would not achieve the project's purpose and would conflict with the Commission's regulations and policy.[74]  Specifically, East Tennessee notes that, under its tariff, it operates its system on an open access basis and shippers are not prioritized based on the direction of flow.[75]  Additionally, East Tennessee states that acquiring additional gas storage would not reduce reliance on displacement and that storage cannot be an alternative to the proposed project because transmission and storage are unbundled services under its tariff.[76]  Last, East Tennessee asserts that constructing expansion facilities to serve incremental shippers would not achieve the project's purpose of reducing displacement in order to provide more reliable service to existing customers.[77]

### b.    Commission Determination

32.    We find that East Tennessee has demonstrated that the System Alignment Project is needed to enhance both west-to-east and east-to-west transportation on its system, which will allow it to continue to reliably meet its existing natural gas transportation service obligations to existing customers.  In response to the Commission staff's August 30, 2023 data request, East Tennessee provided examples where displacement was required to provide service for both east-to-west shippers and west-to-east shippers. Although a certain amount of displacement has been a part of East Tennessee's system design since 2000, utilization of the system by customers has changed over time, as more gas was sourced from the Marcellus and Utica Shales to take advantage of lower gas prices on the west end of East Tennessee's system.[78]

---

[72] *Id.* at 10-11.

[73] *See supra* n.65.

[74] East Tennessee Jan. 25, 2024 Data Response at 1.

[75] *Id.* at 1-2 (citing 18 C.F.R. § 284.7(b) (2023)).

[76] *Id.* at 2 (citing *Pipeline Serv. Obligations & Revisions to Reguls. Governing Self-Implementing Transp. Under Part 284 of the Comm'n's Reguls.,* Order No. 636, FERC Stats & Regs. ¶ 30,939 (cross-referenced at 59 FERC ¶ 61,030) (1992)).

[77] *Id.* at 3.

[78] East Tennessee Sept. 14, 2023 Data Response at 4-9 and Affidavit of Ryan James, pages 3-4.  East Tennessee attributes these changes in utilization to:  (1) increases

33.     East Tennessee explains that displacement was required on 239 of 304 days in the 10-month period from November 1, 2022, through August 31, 2023, because the west-to-east nominations through the Boyds Creek Compressor Station exceeded the physical west-to-east capacity of 133,000 dekatherms per day (Dth/d).[79]  Similarly, from July 1, 2023, through July 31, 2023, East Tennessee had an average scheduled west-to-east quantity through the Boyds Creek Compressor Station of approximately 212,000 Dth/d, but only averaged approximately 10,000 Dth/d of east-to-west nominations (displacement flow), exceeding the physical capacity of the station.  East Tennessee explains that it was required to use operational measures, which in the past have included the purchasing of gas, the use of line pack, and third party interconnect assistance, to offset the difference between the physical capacity and net scheduled quantities.[80]  It states that such operational measures are costly, inefficient, and unreliable.[81]  With respect to east-to-west flows through the Glade Spring Compressor Station, East Tennessee notes that displacement was required on 78 of 304 days from November 1, 2022, through August 31, 2023, because the east-to-west nominations through the Glade Spring Compressor Station exceeded the physical east-to-west capacity at the station (approximately 164,000 Dth/d).[82]

34.     The System Alignment Project will enable East Tennessee to more reliably meet its firm contractual commitments and reduce the risk of service disruptions. Additionally, the proposed project will reduce East Tennessee's reliance on operational measures currently being used to meet its service obligations.  Moreover, East Tennessee has demonstrated that the alternatives suggested by ETG would not meet the project's purpose of reducing displacement on East Tennessee's system.  Therefore, we find that East Tennessee has demonstrated a need for the proposed project.

---

in the quantity of gas nominated in the primary direction of physical flow, including the number of days these quantities exceeded the physical capacity on the system in that direction; and (2) a decrease in displacement operations, i.e., nominations in the direction opposite the primary direction of flow.  *Id.* at Affidavit of Ryan James, page 3.

[79] *Id.* at 5.

[80] *Id.*  East Tennessee notes that it is required to use operational measures any time the net nominations through a compressor station exceeds the physical capacity of that station.  East Tennessee states that it purchased gas on 105 of 304 days between November 1, 2022 and August 31, 2023.  *Id.* at 5-6.

[81] *Id.* at Affidavit of Ryan James, pages 6-7.

[82] *Id.* at 7.

### 3.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

35.    Atmos and Piedmont argue that East Tennessee does not try to mitigate or eliminate adverse effects on west-to-east customers,[83] noting that those customers will shoulder a larger burden of the project's cost while the benefits will go mostly to east-to-west shippers.  Citing to the Certificate Policy Statement, Atmos and Piedmont note that "the more adverse impact a project would have on a particular interest, the greater the showing of public benefits from the project required to balance the adverse impact."[84] They contend that for projects that serve only existing customers, "a stronger showing of benefits must be made[;]" therefore, vague assertions of public benefits are insufficient to overcome the adverse impacts in this case.[85]  The Commission has found projects "designed to maintain existing services by improving system reliability" result in positive impacts on existing shippers.[86]  Here, as discussed above, the project is designed to benefit existing customers by enhancing operational reliability and mitigating the risk of service disruptions.  Therefore, we find that the proposed project will not adversely affect service to East Tennessee's existing customers, or to other pipelines and their captive customers.

36.    We also find that there will be no adverse impact on other pipelines in the region or their captive customers because the project will not displace existing service on other pipelines.  Further, we are satisfied that East Tennessee has taken steps sufficient to minimize adverse impacts on landowners and surrounding communities.  The proposed facilities were designed to maximize colocation with existing utility rights-of-way and transportation corridors.  East Tennessee has or expects to obtain voluntary easements or permits as necessary from the property owners whose land the project will cross.[87]

---

[83] Atmos and Piedmont Protest at 6-7.

[84] *Id.* at 7 (quoting Certificate Policy Statement, 88 FERC at 61,749 (internal quotation marks omitted)).

[85] *Id.* (quoting Certificate Policy Statement, 88 FERC at 61,748).

[86] *Great Basin Gas Transmission Co.*, 182 FERC ¶ 61,088 at P 14; *see, e.g.*, *Transcon. Gas Pipeline Co.*, 185 FERC ¶ 61,130 at P 33; *N. Nat. Gas Co.*, 175 FERC ¶ 61,238 at P 14; *Tex. E. Transmission, LP*, 169 FERC ¶ 61,235 at P 11.

[87] Application at 12-13.

### 4.    Certificate Policy Statement Conclusion

37.    The proposed project will increase the reliability on East Tennessee's system by reducing East Tennessee's reliance on displacement and other operational measures such as purchasing gas, using line pack, and relying on other interconnected pipelines. Accordingly, we find that East Tennessee has demonstrated a need for the project. Further, the project will not have adverse impacts on service to existing shippers or on other pipelines and their existing customers, and will have minimal economic impacts on the interests of landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[88]

### C.    Ridgeline Expansion Project (CP23-516-000)

38.    ETG asserts that East Tennessee fails to discuss the relationship between the System Alignment Project and East Tennessee's Ridgeline Expansion Project.[89]  It asks the Commission to investigate the extent to which East Tennessee's contracting practices are contributing to or the cause of East Tennessee's identified displacement concerns.[90]  The System Alignment Project and Ridgeline Expansion Project are unrelated.[91]  The Ridgeline Project involves the construction of a lateral to create new capacity, 100 percent of which is subscribed to serve a Tennessee Valley Authority power plant, on a different part of East Tennessee's system than Line 3330-1, the portion that the System Alignment Project will modify.[92]

### D.    Rates

### 1.    Predetermination of Rolled in Rate Treatment

39.    East Tennessee states that it intends to roll the costs of the System Alignment Project into its system cost of service in a future general NGA section 4 rate proceeding.

---

[88] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[89] The Ridgeline Expansion project has been filed in Docket Nos. CP23-516-000 and CP23-516-001.

[90] East Tennessee Group Aug. 8, 2023 Comments.

[91] EA at 11.

[92] East Tennessee Aug. 16, 2023, Answer at 2-3; *see also* EA at 11.

It notes that the project is designed to modify portions of East Tennessee's existing system to significantly reduce reliance on displacement as part of East Tennessee's system design, which will decrease the risk of service disruptions and allow for enhanced west-to-east and east-to-west transportation on the system. East Tennessee requests that the Commission make a predetermination that it will be appropriate to roll in costs associated with the project facilities in a future NGA section 4 rate case.

### a. Protests and Answers

40.     Protesters request that the Commission defer East Tennessee's request for rolled-in rate treatment should the Commission find the project to be in the public convenience and necessity.[93] They assert that deferral would appropriately shift the burden of proof onto East Tennessee and allow customers to request the necessary data and have full input on a project that East Tennessee has failed to show is prudent. Protesters note that deferring East Tennessee's request for rolled-in rate treatment would not preclude it from demonstrating in its next rate case that the project costs can be rolled into its system rates without a subsidy from existing customers.[94]

41.     Protesters also argue that East Tennessee's application lacks the cost of service and rate information necessary for the Commission to consider whether East Tennessee should be entitled to a predetermination of rolled-in rate treatment. In particular, they assert that East Tennessee improperly omits several cost- and revenue-based exhibits that are fundamental to the Commission's consideration of whether the predetermination is appropriate.[95] Atmos and Piedmont contend that, to show that rolling project costs into system rates would not result in subsidization by existing customers, East Tennessee must demonstrate that project revenues will exceed costs.[96] They assert it is impossible to make such a determination—which is required at the certification stage—without data of the project's costs and revenue, which the omitted exhibits would reflect.[97] Therefore,

---

[93] ETG Protest at 4-5; Atmos and Piedmont Protest at 5, 15-16.

[94] ETG Protest at 13; Atmos and Piedmont Protest at 15-16.

[95] ETG Protest at 8-9 (stating that East Tennessee wrongly omitted Exhibits H (Total Gas Supply), M (Construction, Operation and Maintenance Costs), N (Revenue Expenses and Income), and P (Rates)); Atmos and Piedmont Protest at 11 (same).

[96] *See* Atmos and Piedmont Protest at 10-11 (citing *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199, at P 40, *order on reh'g,* 180 FERC ¶ 61,205 (2022)).

[97] *Id.* at 11-12. Atmos and Piedmont state that Commission precedent requires that this showing be made at the certification stage and requires "sufficient knowledge of the costs of the project, the actual contract volumes subscribed at the time of the project application, and the proposed maximum recourse rate (or the actual negotiated rate if it is

Atmos and Piedmont argue that it would be too speculative to grant a predetermination of rolled-in rate treatment in this proceeding.[98]

42.     Additionally, ETG requests that, at a minimum, the Commission impose an "at-risk" condition on East Tennessee requiring that East Tennessee confirm that "any cost recovery from ratepayers is conditioned on East Tennessee" proving in its next rate case "(1) that the costs of [the project] were prudently incurred; and (2) that the rolled-in recovery of such costs does not result in the unjust, unreasonable, or unduly discriminatory allocation of costs among the shippers."[99]

43.     In response, East Tennessee states that, per Commission precedent, the Commission should grant a predetermination of rolled-in rate treatment because the project is not an expansion project for the benefit of any project shipper, but rather benefits East Tennessee's existing shippers by improving the reliability of existing firm service.[100]  East Tennessee avers that the protesters provided no legal support for their contention regarding the omitted exhibits, which East Tennessee concludes are inapplicable to its application.[101]

44.     East Tennessee also contends that the precedent cited by Atmos and Piedmont to support their argument the Commission should not approve the predetermination is inapposite because those cases involved expansion projects with incremental shippers.[102]

----

lower than the recourse rate)."  *Id.* (quoting *Tex. Gas Transmission, LLC*, 152 FERC ¶ 61,160 (2015)).

[98] *Id.* at 12 (citing *S. Nat. Gas. Co.*, 115 FERC ¶ 61,328, at P 39 (2006) (denying a pipeline's request for a predetermination of rolled-in rate treatment because the costs were speculative and the timing of the cost incurrence was indefinite)).

[99] ETG Protest at 5.

[100] East Tennessee May 22, 2023 Answer at 12 (citing Certificate Policy Statement, 88 FERC at 61,746, n.12).

[101] *Id.* at 12-13.  Specifically, East Tennessee asserts that:  (1) Exhibit H is irrelevant because it is no longer a merchant that supplies natural gas to customers; (2) Exhibit M concerns "arrangements for supervision, management, engineering, accounting legal, or other similar services to be rendered in connection with a project" if not performed by the applicant's employees; (3) Exhibit N is only required for projects that involve new shippers contracts that provide incremental revenues; and (4) Exhibit P is submitted by pipelines to implement a new rate or new service.  *Id.* at 13-15.

[102] *Id.* at 15.

Finally, East Tennessee states that the "at-risk" condition requested by ETG is inappropriate because the Certificate Policy Statement did away with such a condition. Nevertheless, East Tennessee explains that even under the old policy, at-risk conditions were only appropriate for expansion projects that lacked enough commitment by shippers to purchase the newly created capacity, threatening the applicant's ability to recover the project's costs.[103]

### b.        Commission Determination

45.    To support a request for a predetermination that a pipeline may roll the costs of a project into its system-wide rates in its next NGA section 4 rate proceeding, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion. The Certificate Policy Statement recognized the appropriateness of rolled-in rate treatment for facilities constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity, rather than to increase levels of service.[104]

46.    Here, the proposed project will ensure that East Tennessee is able to continue to provide reliable service to its customers. Since no new capacity is being created for sale, no cost of service or rate information is needed for the Commission to consider whether East Tennessee should be granted a predetermination to roll in the costs associated with this project.[105] The proposed project will not create incremental capacity designed to serve incremental shippers and, therefore, there will be no potential cost subsidization for the proposed project by existing shippers for new shippers. Accordingly, no cost-versus-revenue comparison is needed for a predetermination of rolling in the costs where the project is designed solely for system reliability. Therefore, we grant East Tennessee a predetermination that it may roll the costs of the System Alignment Project into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

### 2.        Electric Power Costs

47.    East Tennessee states that it will seek to recover electric power costs associated with the proposed new electric motor driven compressor units and related appurtenances

---

[103] *See id.* at 15-16 (citing Certificate Policy Statement, 88 FERC at 61,743; *ANR Pipeline Co.*, 82 FERC ¶ 61,145, at 61,536 (1998)).

[104] Certificate Policy Statement, 88 FERC at 61,746 n.12.

[105] We also agree with East Tennessee that an "at-risk" condition is inappropriate for programs designed to improve reliability for existing customers. *See* Certificate Policy Statement, 88 FERC at 61,743.

to be installed at the proposed Draper and Talbott Compressor Stations through an electric power cost tracker mechanism to be established in a future NGA section 4 filing.[106]  We agree that a future NGA section 4 filing is an appropriate forum for matters related to the electric power costs of the new electric compressors.

### 3.    Reporting Requirements

48.    We require East Tennessee to keep separate books and accounting of costs and revenues attributable to the System Alignment Project in the same manner as required by section 154.309 of the Commission's regulations.[107]  The books should be maintained with applicable cross-references; the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[108]

### E.    Environmental Analysis

49.    On August 10, 2022, Commission staff began its environmental review of the System Alignment Project by granting East Tennessee's request to use the Commission's pre-filing review process, assigning Docket No. PF22-8-000.[109]  The Commission's pre-filing process is designed to encourage early involvement by the public and government agencies in the development of proposed natural gas transmission projects, prior to the filing of a formal application.  As part of the pre-filing review, East Tennessee conducted four open house public meetings between September 19 and 22, 2022, in Seymour and Morristown, Tennessee; Glade Spring, Virginia; and Eden, North Carolina.  Commission

---

[106] Application at 18.

[107] 18 C.F.R. § 154.309 (2023); *see Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

[108] *See Revisions to Forms, Statements, and Reporting Requirements for Nat. Gas Pipelines*, Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).  In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710.  However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[109] Letter Approving East Tennessee's Request to Use the Commission's Pre-Filing Review Process, Docket No. PF22-8-000 (Aug. 10, 2022); *see also* 18 C.F.R. § 157.21(b) (2023).

staff participated in all four meetings to explain the Commission's environmental review process to interested stakeholders.

50.     During the pre-filing review, the Commission issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned System Alignment Program Project* (Notice of Scoping) on October 19, 2022, establishing a 30-day public scoping period. The Notice of Scoping was published in the *Federal Register* on October 25, 2022,[110] and mailed to stakeholders on Commission staff's environmental mailing list for the project, including affected landowners; federal, state, and local officials; Native American Tribes; agency representatives; environmental and public interest groups; local libraries and newspapers; and other stakeholders who had indicated an interest in the project.

51.     In response to the Notice of Scoping, the Commission received comments about the project from the United States Environmental Protection Agency (EPA); the Bureau of Indian Affairs (BIA); several state agencies in Tennessee and Virginia; Native American Tribes; Appalachian Voices; and 14 individuals. Commission staff also held a virtual scoping meeting by telephone on November 16, 2022, during which four individuals provided comments. The primary issues raised by commenters during the scoping process included concerns about soil erosion, groundwater, surface water, wetlands, vegetation, wildlife, historic sites, visual resources, property values, traffic, environmental justice, air emissions, noise, safety, and climate change.[111] Several commenters also requested alternative siting for the Talbott Compressor Station. The pre-filing process ended on March 31, 2023, when East Tennessee filed its application.

52.     On May 30, 2023, the Commission issued a *Notice of Schedule for the Preparation of an Environmental Assessment for the System Alignment Program Project.* The notice was published in the *Federal Register* on June 6, 2023,[112] and mailed to stakeholders on the project's environmental mailing list.

53.     To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[113] Commission staff prepared an environmental assessment (EA) for East

---

[110] 87 Fed. Reg. 64,473 (Oct. 25, 2022).

[111] Additionally, the Teamsters National Pipeline Labor Management Cooperation Trust commented in support of the project on behalf of local Teamsters unions in North Carolina, Tennessee, and Virginia.

[112] 88 Fed. Reg. 37,050 (June 6, 2023).

[113] 42 U.S.C. §§ 4321 *et seq. See also* 18 C.F.R. pt. 380 (2023) (Commission's regulations implementing NEPA).

Tennessee's proposal, which was issued on November 17, 2023.  The notice of availability for the EA, which was mailed to the environmental mailing list, established a 30-day comment period.[114]  The analysis in the EA addresses geology; soils; water resources and wetlands; fisheries, vegetation, and wildlife; cultural resources; land use and recreation; socioeconomics; environmental justice;[115] air quality; noise; reliability and safety; cumulative impacts; and alternatives.  All substantive environmental comments received during the scoping process were addressed in the EA.

54.    In response to the EA, the Commission received comments from the North Carolina Wildlife Resources Commission (NCWRC), the Virginia Department of Environmental Quality (VDEQ), EPA, Appalachian Voices, and one affected landowner, Jeffrey J. Cox.[116]  The comments included concerns regarding public engagement and landowner notice; impacts to historic properties; state and federal permits and agency consultations; minimizing impacts on wetlands, waterbodies, and wildlife; and air quality impacts.  Additionally, we received 21 comments from individuals expressing support for the project.  East Tennessee filed reply comments to EPA's and Mr. Cox's comments.

55.    After Commission staff issued the Notice of Scoping, Congress enacted the *Fiscal Responsibility Act of 2023*.[117]  A section titled "Builder Act" amended NEPA in several ways.[118]  NEPA section 102(c), as amended, requires that agencies prepare NEPA documents on:

---

[114] EPA notes that our *Notice of Availability* states that the Talbott Compressor Station will be a 6,000-horsepower compressor station while the EA states that the Talbott Compressor Station will be a 7,000-horsepower compressor station.  EPA Dec. 13, 2023 Comments on EA at 2.  We clarify that the Talbott Compressor Station will be a 7,000-horsepower compressor station.  This clarification does not change the analysis or conclusions of the EA.

[115] Under NEPA, the Commission considers impacts to all potentially affected communities.  Consistent with Executive Order 12898 and Executive Order 14008, the Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities.  Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  *See infra*, PP 87-94.

[116] Jeffrey J. Cox Jan. 30, 2024 Comments.

[117] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10 (June 3, 2023).

[118] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at

**(i)** reasonably foreseeable environmental effects of the proposed agency action;

**(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

**(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

**(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.[119]

56.     The Commission has complied with its NEPA responsibilities under both versions of the statute.[120]

## 1.    **Public Engagement and Landowner Notice**

57.     In its comments on the EA, Appalachian Voices questions the effectiveness of East Tennessee's and the Commission's public engagement efforts and expresses the desire for additional public outreach.[121]  As described in the EA,[122] East Tennessee began

---

§ 321 (June 3, 2023) ("Builder Act").

[119] 42 U.S.C. § 4332(c)(i).

[120] We note that on July 31, 2023, the Council on Environmental Quality published a Notice of Proposed Rulemaking to revise its regulations implementing NEPA, including to implement the Builder Act amendments.  88 Fed. Reg. 49,924.  The Commission will monitor this proceeding to inform the Commission's practices going forward.

[121] Appalachian Voices Dec. 18, 2023 Comments on EA at 1-2.

[122] EA at 9-12.

initial informational meetings for landowners and public officials in April 2022, before the Commission's pre-filing review process commenced. During the pre-filing process, East Tennessee hosted four additional community open house meetings in September 2022 to inform stakeholders about the project and to provide an opportunity for stakeholders to ask questions and express concerns. Announcements of these open houses were printed in local newspapers, and flyers were posted to bulletin boards of area town halls, libraries, post offices, recreation centers, and grocery/retail stores. Additionally, between October 2022 and November 2023, the Commission issued four notices regarding the project that were posted to the Commission's eLibrary docket, published in the *Federal Register*, and mailed to the environmental mailing list. Therefore, we find that affected landowners and the public had sufficient opportunities and time to learn about the project, express their concerns, and review and comment on the EA.

58.    Mr. Jeffrey J. Cox also filed comments indicating that he is an affected landowner and stating he was not aware of the Commission's public process earlier than December 2023.[123] Our regulations require that applicants "make a good faith effort" to notify landowners that would be affected by the project.[124] County appraisal district information is typically used by applicants and the Commission to compile landowner contact information, and environmental mailing lists are updated throughout NEPA document preparation based on comments received, mail returns, and as updated information becomes available. We have confirmed that the registered owner of the real estate parcel cited by Mr. Cox, per Sevier County appraisal district information, was included on the mailing list for the project Notice of Scoping and all subsequent notices. Therefore, we find that a good faith effort was made to notify the owner of the parcel.

## 2.    Outstanding Information

59.    EPA notes that Appendix D of the EA identifies permits, consultations, and approvals that remain outstanding, and states that inclusion of this outstanding information would better support the Commission's recommendations, conclusions, and mitigation measures.[125] VDEQ also identifies several state permits and requirements that East Tennessee may be required to obtain.[126] Appalachian Voices requests that the Commission extend or reopen the comment period once this outstanding material has been submitted, pointing in particular to avoidance and mitigation details for the

---

[123] Jeffrey J Cox Jan. 30, 2024 Comments at 2.

[124] 18 C.F.R §157.6(d) (2023).

[125] EPA Comments on EA at 2

[126] VDEQ Dec. 15, 2023 Comments on EA at 2-6.

milkweed population along the Bristol to Glade Spring Pipe Replacement and completion of consultation with the U.S. Fish and Wildlife Service (FWS).[127]

60.    Environmental Condition 9 of this order requires that East Tennessee file documentation that it has received all applicable authorizations required under federal law before commencing construction or abandonment activities.  Additionally, Environmental Condition 15 states that East Tennessee cannot begin construction or abandonment activities until Commission staff completes consultation with FWS under section 7 of the Endangered Species Act (ESA).  And Environmental Condition 14 requires East Tennessee to file a detailed description of the milkweed population at milepost 5.6 and specific avoidance and/or mitigation measures to minimize impacts prior to constructing the Bristol to Glade Spring Pipe Replacement.  Information filed by East Tennessee to fulfil the pre-construction environmental conditions of this order will be available on the docket for public review.

61.    Moreover, East Tennessee is responsible for obtaining and maintaining all permits and approvals required to construct and operate the project. The Commission encourages cooperation between interstate pipelines and local authorities, noting that state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  Accordingly, we conclude that we have sufficient information to issue this order and that any additional information will be dealt with appropriately.

### 3.    **Cultural Resources**

62.    Mr. Cox asserts that there has been insufficient review of the historical impact of the project on his property in Sevier County, Tennessee.  He states that this parcel is part of the Keener-Johnson Farm, which is on the National Historic Register of Historic Places, contains an abandoned Civil War railroad easement, and is in the vicinity of an "abandoned, but occasionally maintained, historic African American cemetery," and a "historic strand of trees."[128]  Mr. Cox requests that the Commission postpone further action on the application until the environmental effects on the historic trees, the cemetery, and the Civil War site are assessed.[129]

63.    The EA acknowledges that compliance with requirements of Section 106 of the National Historic Preservation Act has not been completed.  The EA included a recommendation (Environmental Condition 16) that East Tennessee not begin

---

[127] *See* Appalachian Voices Comments on EA at 1-2.

[128] Jeffrey J Cox January 30, 2024 comments at 1.

[129] *Id.*

construction of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads until Section 106 compliance requirements have been completed.[130]  We have modified the EA's recommendation and included it as Environmental Condition 16 in the appendix to this order to address Mr. Cox's concerns, and require East Tennessee to file information regarding whether the historic resources that Mr. Cox mentions in his comment would be affected by the project and include any consultation documentation with the Tennessee State Historic Preservation Officer.

### 4.    Non-Jurisdictional Facilities

64.    EPA recommends that the EA include topographic maps showing the approximate location of the power lines needed for the project.  EPA also suggests that the Commission review its regulations regarding environmental analysis of non-jurisdictional facilities to determine whether the Commission should review such facilities associated with the project.[131]  As stated in the EA,[132] non-jurisdictional facilities associated with the project include the extension of existing communication lines; installation of new telecommunication towers within the property boundaries of each new compressor station; installation of new powerlines; and improvements to or expansion of water infrastructure to supply both new compressor stations with potable water during operation.  All permitting for the construction and operation of the non-jurisdictional facilities would be the responsibility of the infrastructure provider or utility, rather than East Tennessee.  The approximate locations of the non-jurisdictional powerlines are not yet known;[133] therefore, the EA could not include mapping of their approximate location.  However, cumulative impacts associated with these facilities, as known, are discussed in the EA.[134]

### 5.    Blasting

65.    EPA recommends notifying nearby communities before blasting occurs, with additional notification time given to livestock owners.[135]  East Tennessee states that blasting will not begin until occupants of nearby buildings, stores, residences, places of

---

[130] EA at 42.

[131] EPA Comments on EA at 2 (citing 18 C.F.R. § 380.12(2)(i)(ii) (2023)).

[132] EA at 9.

[133] East Tennessee Jul. 11, 2023 Data Response at 14.

[134] EA at 92 – 109.

[135] EPA Comments on EA at 2.

businesses, and farms have been notified,[136] and that it will mail a letter to affected landowners notifying them of the construction activities and providing local contact information for any construction-related concerns.[137]  Notification will be provided at least three days before construction commences, unless more advanced notice is agreed to during easement negotiations.[138]  We find these measures appropriate and responsive to EPA's concerns.

### 6.    Water Resources and Wetlands

66.    VDEQ provides several recommendations regarding impacts on waterbodies and wetlands from the Bristol to Glade Spring Pipe Replacement.  The recommendations include using directional drilling from upland locations; operating equipment outside of streambeds and wetlands; using synthetic mats when in-stream work is unavoidable; stockpiling trench spoils for use during restoration; and segregating the topsoil of excavated wetlands.[139]

67.    As described in the EA,[140] the project will include 34 waterbody crossings.  Except for four perennial intermediate waterbody crossings, all other crossing locations are categorized as "minor," being less than 10 feet wide at the crossing location of 11 perennial, 7 intermittent, and 12 ephemeral streams.  The project will cross two wetlands, disturbing a total of approximately 0.1 acre of wetlands.  The EA describes East Tennessee's measures to minimize impacts on waterbodies and wetlands, including the use of trenchless and dry open cut crossing methods.  East Tennessee considered the use of directional drilling for the six minor waterbodies to be crossed in Virginia and determined that directional drilling would result in additional impacts.[141]  We agree that the workspace requirements for directional drill equipment would increase ground disturbance at these crossing locations that would offset the minor benefits gained by crossing waterbodies this small using directional drills (five of the waterbodies are between 1 and 4 feet wide and one is 9 feet wide).  As also described in the EA, East Tennessee will implement measures in the FERC's *Wetland and Waterbody Construction*

---

[136] Application at Resource Report 6.

[137] *Id.* at Resource Report 1.

[138] *Id.* at Resource Report 8.

[139] VDEQ Comments on EA at 2.

[140] EA at 28.

[141] East Tennessee Jan. 22, 2024 Data Response at 6-7.

*and Mitigation Procedures* (FERC Procedures) and its Erosion & Sedimentation Control Plan, which are consistent with VDEQ recommendations.

68.    We also note that the EA included Environmental Condition 12 for East Tennessee to file complete water quality certification(s) issued by the Tennessee Department of Environment and Conservation and the VDEQ.  We have modified Environmental Condition 12 in the appendix to this Order to appropriately reflect the Commission's authorities under the EPA's final "*Clean Water Act Section 401 Water Quality Certification Improvement Rule,*" effective November 27, 2023, which retracted elements of the "*2020 Clean Water Act Section 401 Certification Rule*" pertaining to review and waiver of water quality certificate conditions by the federal action agency.

## 7.    Erosion Control and Revegetation

69.    NCWRC recommends that East Tennessee:  (1) install erosion and sedimentation controls prior to any land-disturbing activity; (2) remove all silt fencing once vegetation is re-established and soils are stabilized; and (3) use native plants when seeding disturbed areas.[142]  In accordance with the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and East Tennessee's Erosion and Sedimentation Control Plan , East Tennessee will install temporary erosion controls immediately following initial soil disturbance and will maintain or reinstall these devices until permanent erosion control devices are established or restoration is complete.  East Tennessee will revegetate and landscape disturbed upland areas with weed-free native seed mixes in accordance with state and local recommendations and any landowner agreements.[143]  We find these measures consistent with the NCWRC recommendations.

70.    NCWRC also recommends that stormwater outlets drain through vegetated upland areas prior to reaching any stream or wetland area, and that East Tennessee use low-impact development techniques (i.e., installation of bioretention areas to collect stormwater from impervious surfaces, reduction of road widths, and use of permeable surface materials to reduce stormwater runoff).[144]  State permitting requirements will dictate East Tennessee's installation of permanent stormwater management controls at aboveground facilities.

71.    Finally, NCWRC recommends that East Tennessee utilize biodegradable and wildlife-friendly sediment and erosion control devices.[145]  East Tennessee states that it

---

[142] NCWRC Dec. 18, 2023 Comments on EA at 2.

[143] EA at 38.

[144] NCWRC Comments on EA at 2-3.

[145] *Id.* at 2.

will use erosion control products that either do not contain netting or that contain netting manufactured from 100 percent biodegradable, non-plastic materials such as jute.[146] We find these measures consistent with the NCWRC recommendations.

72.     In its comments on the EA, VDEQ recommends that the use of herbicides and pesticides for construction or landscape maintenance be in accordance with integrated pest management principles.[147] East Tennessee's Invasive Plant Species Management Plan[148] outlines measures to control and limit the spread of invasive weeds during construction, thereby reducing the potential for introduction and establishment of weeds during project restoration and maintenance. In accordance with the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan*, East Tennessee will not use pesticides or herbicides within 100 feet of a wetland or waterbody. Additionally, East Tennessee's Invasive Plant Species Management Plan requires that removal of invasive species during maintenance be conducted manually with mechanical means; use of herbicides is not proposed.[149]

## 8.     Wildlife and Endangered Species Act Consultation

73.     Project areas in Tennessee and Virginia contain suitable habitat and are within the known range of the federally listed Northern long-eared bat (*Myotis septentrionalis*) and Indiana bat (*Myotis sodalis*). EPA asserts that as the lead agency responsible for ensuring Endangered Species Act (ESA) section 7[150] consultation for the project, the Commission should initiate formal consultation with FWS. Formal consultation with FWS is required only for proposed actions that are likely to adversely affect an ESA-listed species. As discussed in the EA, informal consultation is appropriate with respect to listed species for which a project will have "no effect" or will be "not likely to adversely affect.".[151] East Tennessee, as a non-federal representative, is assisting the Commission in meeting our obligations to engage in informal consultation with FWS under section 7 of the ESA and our implementing regulations.[152] Completing informal consultation requires assessing

---

[146] East Tennessee Jan. 22, 2024 Data Response at 4.

[147] VDEQ Comments on EA at 4.

[148] East Tennessee Mar. 31, 2023 Application at app. 3B (Invasive Plant Species Management Plan).

[149] *Id.*

[150] 16 U.S.C. § 1536.

[151] EA at 38.

[152] 18 C.F.R. § 380.13 (2023).

the impacts of the project on federally listed species. As the project overlaps three FWS Ecological Services Field Offices in Tennessee, Virginia, and North Carolina,[153] East Tennessee submitted a request to initiate section 7 consultation and designate a lead FWS field office to coordinate a project-level review in June 2023. Because consultation with the FWS has not yet been completed, Environmental Condition 15 requires that East Tennessee not begin construction activities until Commission staff completes ESA consultation with the FWS.[154]

74.    Relatedly, NCWRC recommends avoiding tree clearing during the maternity bat roosting season from May 15 to August 15.[155] Neither the Northern long-eared bat nor the Indiana bat were identified in FWS's Information for Planning and Consultation database with presence in the portion of the project area in North Carolina; however, as discussed above, FWS concurrence for the entire project is pending, and any necessary restrictions related to tree clearing will be determined as part of the ESA consultation process. To date, consultations with FWS for the project facilities in Tennessee and Virginia, where suitable foraging and roosting habitat is present, have not identified the need for any tree clearing restrictions. [156] Overall, tree clearing for the project has been minimized by incorporating previously disturbed lands into the pipeline routes. The project would require clearing 53 acres of forest.

75.    VDEQ recommends that East Tennessee contact the Virginia Department of Natural Heritage for updated information on natural heritage resources[157] before the project is constructed. East Tennessee consulted the Virginia Natural Heritage Program and Department of Wildlife Resources during development of the project application and conducted field surveys in 2022 that did not identify state-listed species in project work areas.[158]

---

[153] EA at 35-36.

[154] *Id.* at 37.

[155] NCWRC Comments on EA at 2.

[156] EA at 36.

[157] VDEQ defines "natural heritage resources" as "…the habitat of rare, threatened, or endangered animal and plant species, unique or exemplary natural communities, and significant geologic communities."  VDEQ Comments on EA at 5.

[158] EA at 39.  State-listed species and their habitat description are provided in appendix H of the EA.

76.    Mr. Cox contends that the Boyds Creek Loop portion of the project will divide a land parcel (Kenner-Johnson Farm) with wildlife habitat at one end of the property.[159] He states that the proposed pipeline would affect trees planted for cultivation and would reduce available bird habitat in the area.  Mr. Cox also asserts that the property owners want to divide the property among themselves for development value, and the project pipeline would make further property division more costly and complex.[160]  Project disturbance will be restricted to certificated workspaces as detailed on project alignment sheets, and thus the trees north and west of the proposed workspace will not be disturbed. The Boyds Creek Loop will be constructed adjacent to and within the same permanent easement as East Tennessee's existing 16-inch-diameter pipeline (Line 3300-1) on Mr. Cox's property; therefore, the project will not further divide the property and tree clearing on the property will be minimal and limited to temporary workspace adjacent to the existing easement.  As a result and as further detailed in the EA,[161] impacts on wildlife will be temporary to long-term but minimal, lasting only until revegetation is complete.

## 9.    Greenhouse Gas Emissions and Climate Change

77.    The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which includes those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[162]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take into account in reaching a decision."[163]

---

[159] Jeffrey J Cox Jan. 30, 2024 Comments at 1-2.

[160] Id.

[161] EA at 33-34.

[162] 40 C.F.R. § 1508.1(g) (2023).

[163] Id. § 1508.1(aa).  See generally Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law'") (citation omitted); Food & Water Watch v. FERC, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); Sierra Club v. FERC, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (Sabal Trail) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

78.    We find that the GHG emissions from project construction and operation are reasonably foreseeable.[164]  The EA estimates that construction of the System Alignment Project will result in up to 103,459 metric tons of carbon dioxide equivalent ($CO_2e$) emissions.[165]  The project's estimated operational emissions (e.g., natural gas combustion from space heaters at compressor stations, fugitive emissions, venting, blowdowns, and emergency generator operations)[166] will result in 43,166 metric tons per year (tpy) of $CO_2e$ emissions.[167]

79.    The EA estimates that the social cost of GHGs from construction and operation[168] of the project is either $23,242,554 (assuming a discount rate of 5%), $59,469,365 (assuming a discount rate of 3%), and $80,458,316 (assuming a discount rate of 2.5%) or $160,105,608 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).[169]  The EA states that "[c]onstruction and operation of the Project would increase the atmospheric concentration of GHG in combination with past, current, and future emissions from all other sources globally, and would contribute incrementally to future climate change impacts."[170]

80.    As we have done in prior orders, we compare GHG emissions to the total GHG emissions of the United States as a whole and at the state level.  This comparison allows us to contextualize the project's emissions.  At a national level, 5,586 million metric tons of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).[171]  Construction

---

[164] EA at 106.

[165] *Id.*

[166] *Id.* at 77.

[167] *Id.* at 106.

[168] The EA mistakenly refers only to "emissions from operation," *id.* at 108, but in fact the social cost of GHGs calculated includes emissions from both operation *and* construction of the project.

[169] *See id.* at 104; *see id.* for a description of the method and assumptions staff uses for calculating the social cost of GHGs.  The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[170] EA at 106.

[171] EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021 at ES-5 (Table ES-2) (April 2023), https://www.epa.gov/ghgemissions/inventory-us-

emissions from the project could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.002%;[172] in subsequent years, the project operations could potentially increase emissions nationally by 0.0008%.[173]

81.    At the state level, $CO_2$ emissions from fossil fuel consumption in 2021 were 92.7 million metric tons of $CO_2$ in Tennessee, 98.0 million metric tons of $CO_2$ in Virginia, and 115.6 million metric tons of $CO_2$ in North Carolina.[174]  Construction emissions from the project could potentially increase $CO_2$ emissions based on the Tennessee, Virginia, and North Carolina 2021 levels by 0.05%, 0.04%, and 0.02%, respectively.[175]  In subsequent years, project operations could potentially increase $CO_2$ emissions based on the Tennessee, Virginia, and North Carolina 2021 levels by 0.02%, 0.001%, and 0.02%.[176]

82.    When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context.[177]  Tennessee has not set statewide goals for GHG emissions reduction targets.  Virginia established a statutory target for net-zero GHG emissions by 2045.[178]  North Carolina established executive targets to reduce GHG emissions 50% below 2005 levels by 2030 and to reach net-zero by 2050.[179]  The project's operational emissions in North Carolina in 2030 would represent 0.04% of the state's total targeted maximum annual GHG emissions.[180]

---

greenhouse-gas-emissions-and-sinks-1990-2021.

[172] EA at 107.

[173] *Id.*

[174] U.S. Energy Information Administration, Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted: Tennessee (July 2023), Virginia (July 2023), North Carolina (July 2023), https://www.eia.gov/environment/emissions/state/.

[175] EA at 107.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

83.     We clarify that, for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[181]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[182] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[183]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[184]  Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[185]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess

---

[181] *Id.* at 106.  We note that "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."  *Id.*

[182] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[183] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *aff'd sub nom. Appalachian Voices v. FERC*, No. 15-1271, 2019 WL 847199 (D.C. Cir. 2019); *Del Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[184] *Tenn. Gas Pipeline Co., LL.C.* 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd, Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at * 2 ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act. That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75; *See, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

[185] *See, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

significance.[186]  In fact, the D.C. Circuit recently affirmed the Commission's decision to not analyze the social cost of carbon in its NEPA analysis,[187] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[188]

84.      EPA avers that East Tennessee should consider using switchgears that are free of sulfur hexafluoride, which EPA states is the most potent known greenhouse gas.[189]  East Tennessee states that it will use sulfur hexafluoride in its switchgears because there are "no feasible alternatives" to meet the project's requirements and that it will implement operating practices that minimize sulfur hexafluoride emissions, including following manufacturer's recommendations and schedules for testing and inspection of equipment during operations.[190]  EPA also notes that on December 2, 2023, it issued a final rule that created new requirements for oil and natural gas operations in the New Source

---

[186] *See e.g., Ctr. For Biological Diversity v. FERC*, 67 F4th 1176, 1184 (D.C. Cir. 2023) (*Alaska LNG*) (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order;" describing those reasons as:  (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts;" and recognizing that the Commission's "approach was reasonable and mirrors analysis...previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things)); *Del. Riverkeeper Network v. FERC*, 45 F4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 (same).

[187] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order...FERC's approach was reasonable and mirrors analysis we have previously upheld.")

[188] *Id.*

[189] EPA Comments on EA at 1-2.

[190] East Tennessee Jan. 22, 2024 Data Response at 3.

Performance Standards (NSPS) to reduce methane and smog-forming volatile organic compounds from new, modified, and reconstructed stationary sources.[191]  East Tennessee will be required to comply with the NSPS to reduce methane and volatile organic compound emissions, as applicable to its facilities.

85.     We note that there currently are no accepted tools or methods for the Commission to use to determine significance; therefore, the Commission is not herein characterizing GHG emissions from the project as significant or insignificant.[192]  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

## 10.     Air Quality

86.     VDEQ recommends that East Tennessee minimize construction fugitive dust emissions by implementing measures such as applying water and washing down construction vehicles and paved roadways adjacent to the construction site.[193]  VDEQ further notes additional state regulatory requirements regarding visible emissions, fugitive dust, and open burning, that may be applicable to the project, and that some emissions units may require a state air quality permit prior to beginning construction.[194] East Tennessee indicates it will use fugitive dust emissions mitigation techniques such as applying water or calcium chloride to disturbed land as outlined in its Dust Control Plan.[195]  We note that as of the date of issuance of this order, East Tennessee was awaiting air permits from Virginia, Tennessee, and North Carolina.  East Tennessee will be required to comply with all applicable requirements of their air permits.

---

[191] EPA Comments on EA at 2; *See Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, EPA (Nov. 30, 2023), https://www.epa.gov/system/files/documents/2023-12/eo12866_oil-and-gas-nsps-eg-climate-review-2060-av16-final-rule-20231130.pdf.

[192] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022), which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended and opened to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2.

[193] VDEQ Comments on EA at 3.

[194] *Id.* at 3-4.

[195] EA at 77.

## 11.    **Environmental Justice**

87.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows the instruction of Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[196]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[197]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[198]

---

[196] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance.  *See* 15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/ 2020-04/guidance-manual-volume-1.pdf.

[197] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or Indigenous peoples.  *See* Environmental Protection Agency, EJ 2020 Glossary (Feb. 20, 2024), https://www.epa.gov/system/files/documents/2024-02/ej-2020-glossary.pdf.

[198] Environmental Protection Agency, *Learn About Environmental Justice*, (Feb. 20, 2024), https://www.epa.gov/environmentaljustice/learn-about-environmental-justice.  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of

88.    Consistent with the Council on Environmental Quality (CEQ)[199] and EPA[200] guidance, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[201] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[202] Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[203]

89.    CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.

---

those potentially affected.  *Id.*

[199] CEQ, *Environmental Justice:  Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement during the Commission's environmental review processes.  *See supra*, PP 49-54, 57-58.

[200] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices), https://www.epa.gov/sites/default/-files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[201] *See generally* Exec.  Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[202]  *See Promising Practices* at 21-25.

[203] Here, Commission staff selected Knox, Sevier, Jefferson, and Blount counties, Tennessee; Washington, Smyth, Patrick, Wythe, and Pittsylvania counties, Virginia; and Rockingham County, North Carolina as the reference communities to ensure that affected environmental justice communities are properly identified.  EA at 54.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.

Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county.

90.     To identify potential environmental justice communities during preparation of the EA, Commission staff used 2021 U.S. Census American Community Survey data[204] for the race, ethnicity, and poverty data at the state, county, and block group level.[205] Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.

91.     Once staff collected the block group level data, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[206]  Commission staff assessed whether impacts on an environmental justice community were disproportionately high and adverse based on whether those impacts were predominately borne by that community, consistent with EPA's

---

[204] U.S. Census Bureau, American Community Survey 2017-2021 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, and File# B03002 *Hispanic or Latino origin by race*:  https://data.census.gov/table?q=b17017&tid=ACSDT5Y2021.B17017; https://data.census.gov/table?q=b03002&tid=ACSDT5Y2021.B03002.

[205] For this project, Commission staff determined that the appropriate units of geographic analysis for assessing project impacts on the identified environmental justice communities were block groups crossed by the pipeline and block groups within a radius of one mile around existing and proposed aboveground facilities, including temporary contractor yards.  These distances are sufficiently broad considering the likely concentration of impacts proximal to the existing and proposed facilities and the new electric motor driven compressor units not resulting in operational emissions.  *See* EA at 54.

[206] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

recommendations in *Promising Practices*.[207]  Identified project impacts and proposed mitigation measures are discussed below.

92.     The Commission's environmental staff identified 30 block groups within the geographic scope of analysis, of which 12 block groups exceeded the defined threshold for minority or low-income communities and are therefore environmental justice communities.[208]  Project work within identified environmental justice communities includes construction of portions of the Boyds Creek Loop (MP 0 to MP 2); the Bristol to Glade Spring Pipe Replacement; modifications at the existing Glade Spring Compressor Station (at MP 6.32 of the Bristol to Glade Spring Pipe Replacement); the Rural Retreat Compressor Station; and the Topside M&R Station.  The Sevierville Pike Yard, Route 91 Yard, and Route 609 Yard are also within identified environmental justice communities. In addition, the proposed Draper Compressor Station, while not located within an environmental justice community, is sufficiently close to environmental justice communities (i.e., within one mile) that it was included in the scope of impacts.

93.     The EA determined that potential impacts on the identified environmental justice communities may include visual impacts, socioeconomic impacts including traffic impacts, and air and noise impacts from construction and operation.[209]  Commission staff concluded that environmental justice concerns are not present for other resource areas such as geology, soils, groundwater, surface water, wetlands, wildlife, fisheries, land use, or cultural resources due to the minimal overall impact the project would have on these resources.  We concur with this determination.

### a.     Socioeconomic and Traffic Impacts

94.     With respect to socioeconomic impacts on environmental justice populations, as described in the EA, the impacts of constructing project modifications at existing aboveground facilities are expected to be not significant.[210]  East Tennessee anticipates that 70% of the construction workforce will be non-local, equating to approximately 100

---

[207] *Id*. at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[208] *See* EA at 56-59 (Table 14).

[209] *Id.* at 55.

[210] *Id.* at 67.

workers in Tennessee; approximately 42 workers in Virginia; and approximately 50 workers in North Carolina. This temporary flux of workers into environmental justice communities could affect economic conditions and increase the demand for community services, such as traffic, housing, police enforcement, and medical care. Given the availability of these services in the project vicinity, impacts will not be significant. East Tennessee states it will hire the two new full-time positions needed to operate the Draper Compressor Station from the local/regional labor pool; therefore, the EA concludes that project operation will have less than significant impacts on socioeconomic conditions in environmental justice communities.[211] We agree.

95.    With respect to traffic impacts on environmental justice populations, as described in the EA, the impacts of constructing new aboveground facilities and project modifications at the existing aboveground facilities are expected to be not significant.[212] Traffic impacts will be temporary and limited to periods of active construction. Additionally, project workspaces are at multiple sites spread across three states, thereby reducing the potential for congestion in any one area or community. For pipeline construction, impacts will be further minimized given that ground disturbance and construction crews/equipment may be present at any one location of pipeline construction for temporary periods ranging from several days to several months.[213] Operation of the Draper Compressor Station will not significantly impact traffic for the environmental justice community.[214]

96.    East Tennessee's measures to minimize project traffic disruptions[215] will also mitigate temporary traffic impacts on environmental justice communities. Based on this assessment, the EA concludes that project impacts on traffic conditions in environmental justice communities will be temporary and will not be significant.[216] We agree.

---

[211] *Id.*

[212] *Id.* at 67-68.

[213] *Id.* at 68.

[214] *Id.*

[215] *Id.* at 51-52.

[216] *Id.* at 68.

b.    **Visual Impacts**

97.    With respect to visual impacts on environmental justice populations, as described in the EA, impacts during construction at aboveground facilities will not be significant.[217] Temporary to short-term visual impacts will occur during construction of all project facilities (i.e., large equipment, vehicles, dust, and clearing of vegetation), and minor permanent visual impacts may occur along pipeline rights-of-way from periodic vegetation clearing in previously wooded or scrub-shrub areas to allow for visual pipeline inspection.  The only proposed new permanent easement within an environmental justice community will be between MPs 9.8 and 10.02 on the Boyds Creek Loop.  Due to the presence of nearby residences, use of contractor yards within environmental justice communities (i.e., Sevierville Pike Yard, Route 91 Yard, and Route 609 Yard) will also result in temporary visual impacts.  Following restoration and successful revegetation, project pipeline rights-of-way and impacts at contractor yards will represent a minimal modification of the landscape.  Therefore, given the limited amount of new permanent easement created by the project, the EA concludes that visual impacts on environmental justice communities from pipeline construction and operation and temporary use of contractor yards will be less than significant.[218]

98.    Modifications at the Boyds Creek Compressor Station, Glade Spring Compressor Station, Rural Retreat Compressor Station, and Topside M&R Station will be installed within the stations' existing fence-lines.  These facilities are within environmental justice communities, with the closest residences located between 25 to 100 feet from project workspace.  The new pig launcher/receiver at the Topside M&R Station will not be visible due to existing privacy screen fencing.  The existing Boyds Creek Compressor Station, Glade Spring Compressor Station, and Rural Retreat Compressor Station all have existing screening and vegetation that were constructed to blend in with the surrounding landscape.  Therefore, the EA concludes that proposed modifications at the existing aboveground facilities will not change the general existing visual character of these facilities and permanent visual impacts will be less than significant.[219]

99.    The Draper Compressor Station will not be visible from either environmental justice community within 1 mile of the facility due to distance to each community (approximately 0.25 mile north and 0.9 mile south), existing topography, and existing vegetative buffers that separate the site from both environmental justice communities.

---

[217] *Id.* at 68-69.

[218] *Id.*

[219] *Id.* at 69.

Therefore, the EA concludes that permanent visual impacts, if any, will be less than significant.[220]

100.    Based on the foregoing, we agree with the analysis in the EA and conclude that the project's overall visual impacts on environmental justice communities will be less than significant.

### c.    Air Quality

101.    Construction emissions will occur over the duration of construction activity and will be emitted at different times throughout the project area.  Construction emissions in the form of particulate matter (i.e., dust and exhaust) will result in short-term, localized impacts in the immediate vicinity of construction workspaces.  To mitigate exhaust and dust emissions during construction, East Tennessee will implement its Dust Control Plan, ensure proper maintenance of construction equipment, use low-sulfur diesel fuel, minimize idling of construction vehicles, and use equipment that meets the federal design standard when manufactured and complies with the EPA mobile and non-road emissions regulations.  Based on the scope of the project, the temporary and intermittent nature of construction activities lasting up to 10 months, and review of the estimated emissions, the EA concludes that construction of all project components will not result in significant impacts on air quality and identified environmental justice communities.[221]

102.    Operational emissions will be limited to fugitive leaks, primarily consisting of methane, from aboveground facilities and pipelines.  East Tennessee will minimize fugitive equipment leaks by complying with 40 CFR Part 60, Subpart OOOOa (or OOOOb as applicable).[222]  Specifically, East Tennessee has committed to test emergency shutdown components annually; utilize pump-down techniques; execute pressurized holds on compressor units (which are electric motor-driven); combine maintenance activities; and conduct electronic inspection and testing of the blowdown system.[223]

103.    The EA concludes that the construction and operational emission from the project will not have significant adverse air quality impacts on identified environmental justice communities in the project area.[224]  We agree.

---

[220] *Id.*

[221] *Id.*

[222] *Id.* at 77.

[223] *Id* at 69 - 70.

[224] *Id* at 70.

### d.    Noise

104.    Construction of the project will result in increases to the existing ambient sound level and may result in noise impacts for nearby noise sensitive areas (NSA).  East Tennessee will conduct construction activities primarily between 7:00 am and 7:00 pm, Monday through Saturday, with work on Sundays on an as-needed basis due to "make-up" days caused by inclement weather or other intermittent construction delays.  East Tennessee also states that horizontal directional drill (HDD) construction and hydrostatic testing will occur over a 24-hour, 7-day per week schedule for up to 12 weeks. Additionally, East Tennessee states that some activities may necessitate nighttime work.[225]  Noise impacts due to pipeline construction will be temporary at any one NSA due to the nature of the pipeline construction moving down the pipeline right-of-way.  At aboveground facilities, construction noise will also be temporary, lasting up to 10 months.[226]

105.    The Chapman Highway HDD is along the Boyds Creek Loop and partly located within an environmental justice community (low-income block group).  The nearest residences to the entry and exit site are 200 feet and 50 feet from project workspace, respectively.  East Tennessee states that the HDD construction will occur on a 24-hour basis, 7 days a week until complete (8 to 12 weeks).  Noise impacts due to HDD construction are anticipated to be highest at NSA #1 (200 feet from the entry site), with a 54.6 dBA day-night sound level ($L_{dn}$), which approaches the Commission's limit of 55 dBA $L_{dn}$.  NSA #1 is not within the identified environmental justice community and impacts at other nearby residences are anticipated to be less than at NSA #1.  HDD construction is anticipated to result in noise impacts of up to 1.5 dBA above existing ambient at other nearby NSAs, which is less than the 3 dBA threshold of perceptible noise increase.  However, given the dynamic nature of construction and drilling activities, residences near the HDD may still be impacted by noise during construction.  East Tennessee proposes various noise mitigation measures (including a 310-foot-long noise wall at the entry and a 185-foot-long noise wall at the exit site) to minimize HDD noise impacts.[227]  Additionally, the EA recommends (incorporated herein as Environmental Condition 17) East Tennessee monitor nighttime noise to ensure it is below the Commission's noise limit.

106.    The Sevierville Pike Yard, Route 91 Yard, and the Route 609 Yard are approximately 60 feet, 330 feet, and 125 feet, respectively, from the nearest residences in an environmental justice community.  East Tennessee will minimize noise impacts at

---

[225] *Id* at 8.

[226] *Id.* at 70.

[227] East Tennessee Mar. 31, 2023 Application at Resource Report 9.

these contractor yards by limiting their use to daytime hours only, except for the
Sevierville Pike Yard, which may be utilized during nighttime hours to provide
construction contractors with auxiliary pumps, fuel from onsite storage containment,
transport vehicles, environmental control devices, light plants, and equipment. The EA
recommends (incorporated herein as Environmental Condition 17) East Tennessee
monitor nighttime noise, including the contractor yard, to ensure it is below the
Commission's limit.

107.    While identified environmental justice communities in the project area will be
impacted by noise from project construction, based on the mitigation measures proposed
(including construction occurring primarily during daytime hours and ensuring that
nighttime noise is mitigated and monitored in accordance with staff recommendations),
as well as the short-term nature of construction, the EA concludes that noise impacts on
identified environmental justice communities from construction of the project will be
temporary and not significant.[228]  We agree.

108.    Residents in environmental justice communities in the project vicinity will be
impacted by noise from project operation. Operational noise from the Draper
Compressor Station, Glade Spring Compressor Station, Rural Retreat Compressor
Station, and Topside M&R Station will be less than our noise requirement of 55 dBA $L_{dn}$.
The closest residences in the nearby environmental justice communities are
approximately 4,858 feet south, 280 feet north, 650 feet south, and 325 feet southeast of
the compressor stations respectively. East Tennessee will implement various mitigation
measures to limit operational noise including but not limited to an acoustically insulated
compressor building, acoustical insulation for aboveground gas piping, low-noise gas
aftercoolers, blowdown silencers, and 3-foot-long muffler for all ventilation openings.
Based on the mitigation measures to be installed at each aboveground facility, and
implementation of staff recommendations[229] which will ensure sound levels comply with
the Commission's noise requirements,[230] the EA concludes that operation of the project

---

[228] EA at 70 - 71.

[229] As recommended in the EA, we will require in Environmental Conditions 18,
19, 20, and 21 that East Tennessee file noise surveys to verify the actual noise levels from
operation of the new Draper Compressor Station and modified Rural Retreat Compressor
Station, Glade Spring Compressor Station, and Topside M&R Station comply with our
noise level restriction of 55 dBA $L_{dn}$.

[230] 18 C.F.R. § 380.12(k)(4)(v).

will not result in significant noise impacts on local residents and the surrounding communities, including environmental justice communities.[231]  We agree.

### e.  Cumulative Impacts

109.  With respect to cumulative impacts, the EA identifies two actions, the SR 115 and SR 71 highway improvement projects, that, in conjunction with the project, could contribute to cumulative impacts on environmental justice communities.  Specifically, the SR 115 project is being constructed within Census Tract 56.04, Block Group 2 and the SR 71 project is being constructed in Census Tract 55.02, Block Group 2, both environmental justice communities in Knox County, Tennessee.

110.  The SR 115 project is anticipated to be completed in Summer 2024; therefore, cumulative impacts on environmental justice communities are not anticipated to occur in combination with project activities with the potential exception of minor, localized impacts on vegetation and air emissions (i.e., dust) in the event that temporary workspaces for the SR 115 project have not been fully restored prior to the start of project construction.

111.  Construction of the SR 71 project may be concurrent with East Tennessee's project construction.  Potential cumulative impacts experienced by environmental justice communities living in close proximity (e.g., Census Tract 55.02, Block Group 2) to both East Tennessee's project and the SR 71 project may include traffic delays; localized, elevated levels of fugitive dust and tailpipe emissions near the construction areas; visual impacts; and noise.  An influx of construction workers associated with both projects could also temporarily increase demand for housing and increase calls for public services, such as police, fire, and medical services.  Based on the scope of both projects, impacts on traffic, noise, and air emissions in environmental justice communities will be largely temporary, with a return to baseline conditions after completion of construction and revegetation.  Further, East Tennessee will implement mitigation measures reduce potential impacts on these resources during construction.  Permanent impacts on the viewshed from both projects will be negligible given their occurrence within and adjacent to existing rights-of-way.  For these reasons, the EA concludes that cumulative impacts on environmental justice communities will be temporary and less than significant.[232]  We agree.

---

[231] EA at 71.

[232] *Id* at 103.

### f.    Environmental Justice Conclusion

112.    As described in the EA, the project will have a range of impacts on the environment and individuals living in the vicinity of project facilities, including identified environmental justice communities.  Impacts associated with the construction of the proposed Draper Compressor Station on environmental justice communities will be disproportionate and adverse as they will be predominately borne by an environmental justice community.[233]  Impacts associated with the construction and operation of the Topside M&R Station, a portion of the Boyds Creek Loop, a portion of the Bristol to Glade Spring Pipeline, Line 3600-1 Hydrostatic Test, the Glade Spring Compressor Station, and the Rural Retreat Compressor Station on environmental justice communities will be disproportionate and adverse as they will be predominately borne by an environmental justice community.[234]  Project impacts on identified environmental justice communities associated with construction traffic, visual, air quality, and noise for these components will be temporary and less than significant.[235]  Permanent impacts on environmental justice communities associated with noise, visual resources, and air quality from operation of the Topside M&R Station, Glade Spring Compressor Station, Rural Retreat Compressor Station and Draper Compressor Station will be less than significant.[236]

### 12.    Environmental Analysis Conclusion

113.    We have reviewed the information and analysis contained in the EA, as well as the other information in the record, regarding potential environmental effects of the project. We accept the environmental recommendations in the EA, as modified above, and we are including them as conditions in an appendix to this order.  Based on the analysis in the EA, as supplemented or clarified in this order,[237] we conclude that if the project is constructed and operated in accordance with the East Tennessee's application and supplements, and in compliance with the environmental conditions in the appendix to this

---

[233] *See id.* at 72.

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] Although the analysis in the EA provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion, analysis, or finding in the EA.

order, our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment.[238]

## IV.  **Conclusion**

114.    We find that East Tennessee has demonstrated a need for the System Alignment Project.  Further, the project will not have adverse impacts on existing shippers or other pipelines and their existing customers and will have minimal impacts on the interests of landowners and surrounding communities.  We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires the approval of East Tennessee's System Alignment Project, subject to the conditions in this order.  Additionally, we find that East Tennessee's proposed abandonment is permitted by the public convenience or necessity because there will be no adverse effects on service to existing shippers.

115.    As noted above, the project would not constitute a major federal action significantly affecting the quality of the human environment and compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

116.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[239]

---

[238] We are not making a significance determination regarding GHG impacts for the reasons discussed in PP 83 and 85, *supra.*

[239] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory

117.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

(A)    The certificate of public convenience and necessity is issued to East Tennessee authorizing it to construct and operate the System Alignment Project, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

(B)    East Tennessee is granted permission and approval of the proposed abandonment, as described in this order and in the application.  East Tennessee shall notify the Commission within 10 days of the abandonment of the facilities.

(C)    The certificate authority in Ordering Paragraph (A) is conditioned on East Tennessee's:

(1)    completion of the construction of the proposed facilities and making them available for service within three years of the date of this order, pursuant to section 157.20(b) of the Commission's regulations;

(2)    compliance with all applicable Commission regulations, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

(3)    compliance with the environmental conditions in the appendix of this order; and

(D)    A predetermination is granted for East Tennessee to roll the project's costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

(E)    East Tennessee shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies East Tennessee.  East

---

authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Tennessee shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Clements is dissenting in part with a separate statement attached.

( S E A L )


                                    Debbie-Anne A. Reese,
                                    Acting Secretary.

## Appendix – Environmental Conditions

As recommended in the Environmental Assessment (EA), and modified herein, this authorization includes the following conditions.

1.  East Tennessee Natural Gas, LLC (East Tennessee) shall follow the construction and abandonment procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EA, unless modified by the order.  East Tennessee must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the System Alignment Program Project (project), and abandonment activities.  This authority shall allow:

    a.  the modification of conditions of the order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction, operation, and abandonment activities.

Docket No. CP23-131-000                                                                          - 54 -

3.    **Prior to any construction**, East Tennessee shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EIs' authority and have been or would be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction, abandonment, and restoration activities.

4.    The authorized abandonment activities and facility locations shall be as shown in the EA, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, East Tennessee shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order. All requests for modifications of environmental conditions of the order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

East Tennessee's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the order must be consistent with these authorized facilities and locations.  East Tennessee's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    East Tennessee shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

      a.    implementation of cultural resources mitigation measures;

      b.    implementation of endangered, threatened, or special concern species mitigation measures;

      c.    recommendations by state regulatory authorities; and

      d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.     **Within 60 days of the acceptance of the authorization and before construction or abandonment begins**, East Tennessee shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  East Tennessee must file revisions to the plan as schedules change.  The plan shall identify:

      a.    how East Tennessee will implement the construction and abandonment procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by the order;

      b.    how East Tennessee will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

      c.    the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

      d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material;

Docket No. CP23-131-000                                                                     - 56 -

      e.    the location and dates of the environmental compliance training and instructions East Tennessee will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

      f.    the company personnel (if known) and specific portion of East Tennessee's organization having responsibility for compliance;

      g.    the procedures (including use of contract penalties) East Tennessee will follow if noncompliance occurs; and

      h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for the:

          i.    completion of all required surveys and reports;

          ii.    environmental compliance training of onsite personnel;

          iii.    start of construction; and

          iv.    start and completion of restoration.

7.    East Tennessee shall employ at least one EI per construction spread. The EI(s) shall be:

      a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the order and other grants, permits, certificates, or other authorizing documents;

      b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

      c.    empowered to order correction of acts that violate the environmental conditions of the order, and any other authorizing document;

      d.    a full-time position, separate from all other activity inspectors;

      e.    responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

      f.    responsible for maintaining status reports.

8.    Beginning with the filing of its Implementation Plan, East Tennessee shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  On request, these status reports shall also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    an update on East Tennessee's efforts to obtain the necessary federal authorizations;

    b.    the construction status of the project, work planned for the following reporting period, and any schedule changes for work in environmentally sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EI(s) during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective actions implemented in response to all instances of noncompliance;

    e.    the effectiveness of all corrective actions implemented;

    f.    a description of any landowner/resident complaints that may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

    g.    copies of any correspondence received by East Tennessee from other federal, state, or local permitting agencies concerning instances of noncompliance, and East Tennessee's response.

9.    East Tennessee must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction or abandonment activities**.  To obtain such authorization, East Tennessee must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.   East Tennessee must receive written authorization from the Director of OEP, or the Director's designee, **before placing the project into service**.  Such

authorization would only be granted following a determination that rehabilitation and restoration of the areas affected by the project are proceeding satisfactorily.

11. **Within 30 days of placing the authorized facilities in service**, East Tennessee shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.     that the facilities have been constructed or abandoned in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.     identifying which of the conditions in the order East Tennessee has complied with or will comply with. This statement shall also identify any areas affected by the System Alignment Program Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12. **Within 5 days** of the final determination of the use of the Nationwide Permit 12 issued by the U.S. Department of the Army Corps of Engineers Districts, East Tennessee shall file the complete water quality certification(s) issued categorically by the Tennessee Department of Environment and Conservation and the Virginia Department of Environmental Quality, including all conditions. All conditions attached to the water quality certification(s) constitute mandatory conditions of this Certificate Order. **Prior to construction**, East Tennessee shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification(s) conditions.

13. **Prior to construction of the project facilities in Tennessee**, East Tennessee shall file with the Secretary a description of design, installation, and monitoring measures that it will implement in consideration of regional hazards including, as applicable, secondary seismic hazards (e.g., soil liquefaction, landslide).

14. **Prior to construction of the Bristol to Glade Spring Pipe Replacement**, East Tennessee shall file with the Secretary, for review and written approval of the

Docket No. CP23-131-000                                                                                          - 59 -

Director of OEP, or the Director's designee, a detailed description of the milkweed population at milepost 5.6 and specific avoidance and/or mitigation measures to minimize impacts on the plant community.

15.    East Tennessee shall **not begin** construction or abandonment activities **until**:

    a.    FERC staff receives comments from the U.S. Fish and Wildlife Service (USFWS) regarding the proposed action;

    b.    FERC staff completes Section 7 of the Endangered Species Act consultation with the USFWS; and

    c.    East Tennessee has received written notification from the Director of OEP, or the Director's designee, that mitigation and/or construction/abandonment activities may begin.

16.    East Tennessee shall **not begin** construction of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

    a.    East Tennessee files with the Secretary:

        i.    the final monitoring report for site 2244WG0401 and any comments on the report provided by the Virginia State Historic Preservation Officer (SHPO);

        ii.    response to Jeffrey Cox's EA comment[240] regarding historic resources that may be affected by the project and if those resources would be affected by the project, include consultation documentation with the Tennessee SHPO;

        iii.    any additional site-specific evaluation reports, avoidance plans, monitoring plans, and/or

        iv.    treatment plan(s) that result from consultation with the Tennessee and Virginia SHPOs; and

        v.    concurrence from the Tennessee and Virginia SHPOs on an effect determination for the project.

---

[240] Jeffrey J Cox, January 30, 2024 comments.

     b.     The Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and

     c.     FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans and notifies East Tennessee in writing that avoidance and/or treatment measures (including archaeological data recovery) may be implemented and/or construction may proceed.

All materials filed with the Commission containing **location, character, and ownership information** about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: "**CUI/PRIV – DO NOT RELEASE**."

17.    **During nighttime construction at aboveground facilities, nighttime drilling operations, and nighttime use of contractor yards (7:00 pm to 7:00 am)**, East Tennessee shall monitor noise levels, document the noise levels in the **biweekly** status reports, and restrict the noise attributable to nighttime construction or drilling operations to no more than a day-night sound level ($L_{dn}$) of 55 decibels on the A-weighted scale (dBA) (48.6 $L_{eq}$) at noise sensitive areas (NSA).

18.    East Tennessee shall file with the Secretary noise surveys for the Talbott and Draper Compressor Stations **no later than 60 days** after placing each station into service. If full power load condition noise surveys are not possible, East Tennessee shall file an interim survey at the maximum possible power load **within 60 days** of placing the stations into service and file the full power load survey **within 6 months**. If the noise attributable to the operation of all equipment at the stations under interim or full power load conditions exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, East Tennessee shall:

     a.     file a report with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, on what changes are needed;

     b.     install additional noise controls to meet that level **within 1 year** of the in-service date; and

    c.  confirm compliance with this requirement by filing a second full power load noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

19.    East Tennessee shall file with the Secretary noise surveys for the modified Rural Retreat Compressor Station **no later than 60 days** after placing the modified station into service. If full power load condition noise surveys are not possible, East Tennessee shall file an interim survey at the maximum possible power load **within 60 days** of placing the modified station into service and file the full power load survey **within 6 months**. If the noise attributable to operation of all equipment at the station under interim or full power load conditions exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, East Tennessee shall:

    a.  file a report with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, on what changes are needed;

    b.  install additional noise controls to meet that level **within 1 year** of the in-service date; and

    c.  confirm compliance with this requirement by filing a second full power load noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

20.    East Tennessee shall file with the Secretary noise surveys for the modified facilities at the Glade Spring Compressor Station **no later than 60 days** after placing the modified station into service. If full pressure differential condition noise surveys are not possible at the overpressure protection regulator skid, East Tennessee shall file an interim survey at the maximum possible flow **within 60 days** of placing the modified station into service and file the full flow survey **within 6 months**. If the noise attributable to operation of all equipment at the station under interim or full flow conditions exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, East Tennessee shall:

    a.  file a report with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, on what changes are needed;

    b.  install additional noise controls to meet that level **within 1 year** of the in-service date; and

     c.  confirm compliance with this requirement by filing a second full flow survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

21. East Tennessee shall file with the Secretary noise surveys for the Topside Junction Meter and Regulator Station (Topside M&R Station) **no later than 60 days** after placing the modified station into service. If a full flow rate noise survey at the station's maximum design capacity is not possible, East Tennessee shall file an interim survey at the maximum possible flow rate **within 60 days** of placing the modified station into service and file the full flow load survey **within 6 months**. If the noise attributable to the operation of the Topside M&R Station under interim or full flow load conditions exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, East Tennessee shall:

     a.  file a report with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, on what changes are needed;

     b.  install additional noise controls to meet that level **within 1 year** of the in-service date; and

     c.  confirm compliance with this requirement by filing a second full power load noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

East Tennessee Natural Gas, LLC                    Docket No. CP23-131-000

(Issued March 21, 2024)

CLEMENTS, Commissioner, *dissenting in part*:

1.      I dissent from Paragraphs 83 and 85 of the Order,[1] which is the so-called "*Driftwood* compromise" language claiming that the Commission is incapable of assessing the significance of greenhouse gas (GHG) emissions.

2.      In my concurrence in the 2023 *Transco* order, I explained the history of this language.[2]  In *Driftwood,* the majority suddenly declared that there are no methods for assessing the significance of GHG emissions, and particularly criticized the Social Cost of GHGs protocol.[3]  I have dissented from this language in *Driftwood* and subsequent orders because (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[4] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[5]  I dissent from Paragraph 83 and 85 of this Order for the same reasons.

---

[1] *E. Tenn. Nat. Gas, LLC,* 186 FERC ¶ 61,210, at PP 83, 85 (2024) (Order).

[2] *See Transcon. Gas Pipe Line Co.*, 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco*).

[3] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[4] Docket No. PL21-3.  On February 18, 2022, the Commission issued an Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022), which proposed a NEPA significance threshold of 100,000 tons per year of $CO_2e$.  The Commission subsequently suspended the Interim GHG Policy Statement and opened it to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197, at P 2 (2022).  The Commission has not yet addressed the comments in the reopened docket.

[5] *See Driftwood,* 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting in part at PP 2-3 & n.5); *see also N. Nat. Gas Co.*, 186 FERC ¶ 61,064 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114

3.      As I have said before, the Commission has not seriously studied whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  Rather, the majority simply decided there is no acceptable method, with no explanation of why the Commission departed from the approach taken in earlier certificate orders.[6]  I cannot condone the Commission's refusal to objectively consider

_____

(2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,113 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,063 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Columbia Gas Transmission, LLC*, 186 FERC ¶ 61,048 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047 (2024) (Clements, Comm'r, dissenting at PP 8-9); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (Clements, Comm'r, dissenting in part at PP 1-2); *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶ 61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, LP*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

       [6] Before its decision in *Driftwood,* the Commission had explained that it was not determining the significance of GHG emissions because the issue of how to do so was under consideration in the GHG Policy Statement docket.  *See, e.g., Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174 (2023); *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171, at P 46 & n.93 (2023).  To depart from prior precedent without explanation violates the Administrative Procedure Act.  *See, e.g., W. Deptford Energy,*

potential methods for assessing the impacts of GHG emissions and transparently incorporate analysis of GHG impacts in its determination of the public convenience and necessity under the Natural Gas Act.

      For these reasons, I respectfully dissent in part.


_____

_____

Allison Clements
Commissioner

---

*LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis. . . .") (citations omitted).

Exhibit C

187 FERC ¶ 62,119
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

East Tennessee Natural Gas, LLC                    Docket No. CP23-131-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(May 20, 2024)

Rehearing has been timely requested of the Commission's order issued on March 21, 2024, in this proceeding. *E. Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 (2024). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.


Debbie-Anne A. Reese,
Acting Secretary.

Exhibit D

189 FERC ¶ 61,232
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Mark C. Christie, David Rosner,
                        Lindsay S. See and Judy W. Chang.

East Tennessee Natural Gas, LLC                    Docket No.  CP23-131-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued December 23, 2024)

1.     On March 21, 2024, the Commission issued an order authorizing East Tennessee
Natural Gas, LLC (East Tennessee) to construct and operate the System Alignment
Program Project (Project), which consists of the abandonment of pipeline facilities in
Virginia, and the construction of pipeline facilities, two new compressor stations, and
appurtenant equipment in Tennessee, North Carolina, and Virginia.[1]  On April 19, 2024,
the East Tennessee Group and its members (collectively, ETG) filed a timely request for
rehearing of the Certificate Order.[2]

2.     Pursuant to *Allegheny Defense Project v. FERC*,[3] the rehearing request filed in this
proceeding may be deemed denied by operation of law.  However, as permitted by
section 19(a) of the Natural Gas Act (NGA),[4] we are modifying the discussion in the

---

[1] *E. Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 (2024) (Certificate Order).

[2] ETG is an association of 25 of customers of East Tennessee engaged in the retail
distribution of natural gas.

[3] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[4] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a
court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

Certificate Order and continue to reach the same result in this proceeding, as discussed below.[5]

## I.    Background

3.      East Tennessee owns and operates a natural gas pipeline system extending from central Tennessee through Virginia to North Carolina and south to Georgia.[6]  On March 31, 2023, East Tennessee filed its application for the Project.[7]  The company stated that the Project is designed to improve the operational reliability of its system by minimizing the level of displacement relied upon in the system, and, absent construction of the Project, the operational reliability of the system will be placed at risk and customers will be subject to an increased risk of service disruptions, including of primary firm service.[8]

4.      On May 5, 2023, ETG filed a Motion for Leave to Intervene, Protest, and Request for an Evidentiary Hearing.  On June 5, 2023, ETG filed an electronic request for certain Critical Energy/Electric Infrastructure Information (CEII) with the Commission's CEII Coordinator;[9] namely, ETG requested East Tennessee's 2022 Form No. 567 system flow diagrams.[10]  On July 6, 2023, ETG filed a second electronic CEII request for the same diagrams.

---

[5] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Certificate Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[6] Certificate Order, 186 FERC ¶ 61,210 at P 2.

[7] *See* E. Tenn. March 31, 2023 Abbreviated Application of E. Tenn. Nat. Gas, LLC for a Certificate of Public Convenience and Necessity and Related Authorizations and Order Approving Abandonment.

[8] Certificate Order, 186 FERC ¶ 61,210 at P 2.

[9] *See* 18 C.F.R. § 388.113 (2024) (describing process for seeking CEII data from the CEII Coordinator).  ETG's CEII requests were filed through an electronic form on the Commission's website and were not lodged or otherwise referenced in the docket for this proceeding until ETG submitted its request for rehearing of the Certificate Order.

[10] Each major natural gas pipeline company (as defined at 18 C.F.R. § 260.1(b) (2024)) having a system delivery capacity in excess of 100,000 Mcf per day (measured at 14.73 p.s.i.a. and 60 °F) is required to file a Form No. 567 with the Commission on an annual basis, which contains a diagram or diagrams reflecting certain information relating to the operating conditions on the pipeline's main transmission system during the

5.      On March 21, 2024, the Commission issued the Certificate Order, authorizing the construction and operation of the Project.  The Certificate Order did not reference East Tennessee's Form No. 567 or any of the data contained therein.[11]  No action had been taken on ETG's CEII requests at the time the Commission issued the Certificate Order.

6.      On April 19, 2024, ETG sought rehearing of the Certificate Order, arguing that the Commission erred by issuing the Certificate Order without first providing ETG with the requested Form No. 567 data.

7.      On May 29, 2024, Commission staff provided ETG with the requested CEII data (i.e., East Tennessee's 2022 Form No. 567).

## II.     **Procedural Issue**

8.      On May 3, 2024, East Tennessee filed a request for leave to answer and answer to ETG's rehearing request.  The Commission's Rules of Practice and Procedure generally prohibit answers to a rehearing request.[12]  Accordingly, we deny East Tennessee's request and reject its answer.[13]

## III.    **Discussion**

9.      On rehearing, ETG primarily argues that the Certificate Order is arbitrary and capricious and lacks substantial evidence because it was issued without allowing ETG to access certain CEII that ETG believes is necessary to evaluate project need.[14]  ETG

---

previous twelve months ending on December 31.  *See* 18 C.F.R. § 260.8 (2024).

   [11] A company's Form No. 567 contains system-wide flow data and is not filed in connection with any particular project.  This filing is separate and distinct from Exhibit G,  which is required as part of a certificate application, *see* 18 C.F.R. § 157.14(a)(8) (2024), and contains project-specific flow data (we note that ETG did not request the Exhibit G data, which was filed as CEII, until October 10, 2024). Accordingly, East Tennessee's Form. No. 567 is not part of the record of this proceeding.

   [12] 18 C.F.R. § 385.713(d)(1) (2024); 18 C.F.R. § 385.213(a)(2) (2024).

   [13] In addition, comments were filed in support of ETG's comments questioning whether a predetermination of rolled-in rates was appropriate.  Oct. 22, 2024 letter from Piedmont Nat. Gas Co.; Oct.25, 2024 letter from N. Car. Util. Comm'n.  We note that these comments are outside of the scope of this proceeding.

   [14] Although ETG makes passing reference to aspects of the Certificate Order that it appears to question, *see* Rehearing Request at 10 (discussing whether the Project is needed in light of displacement being part of East Tennessee's system design since

argues throughout its rehearing request that as a result of its failure to receive access to the CEII, it was denied due process under the Administrative Procedure Act (APA) when the Commission issued the Certificate Order.[15]  To the extent that ETG claims due

---

2000); *id.* at 11 (questioning whether a predetermination of rolled-in rates was appropriate), these references are made in the context of ETG not receiving the requested CEII, *see id.* at 11-12 (connecting both arguments to the fact that ETG did not receive the requested CEII prior to issuance of the Certificate Order).  ETG fails to present any of these issues in its Specification of Errors and Statement of Issues. *Id.* at 4-5.  Further, the relief that ETG requests relates to its failure to receive the requested CEII information, specifically asking that:  (1) ETG be authorized to review the relevant CEII data; (2) East Tennessee be directed to provide the relevant CEII data to ETG; and (3) the Commission defer further action in the docket until ETG is provided a reasonable opportunity to review, evaluate, and comment on the relevant CEII data. *Id.* at 12-13.  Accordingly, we do not view ETG's rehearing request as raising any issue with the Certificate Order separate from its contention that the Commission erred by issuing the order prior to it receiving the requested CEII.  *See* 15 U.S.C. § 717r (stating that a rehearing request must set forth with specificity the grounds on which the rehearing is based); 18 C.F.R. § 385.713(c)(2) (same); *see also Constellation Energy Commodities Grp., Inc. v. FERC*, 457 F.3d 14, 22 (D.C. Cir. 2006) ("Parties are required to present their arguments to the Commission in such a way that the Commission knows specifically the ground on which rehearing is being sought.") (cleaned up); *Alliance Pipeline L.P.*, 173 FERC ¶ 61,020, at P 19 & n.35 (2020) (rejecting arguments not raised with sufficient specificity) (citing 18 C.F.R. § 385.713(c)(2)).

[15] Rehearing Request at 6-7; *see also id.* at 8-12 (referencing various sections of the APA).  ETG asserts that East Tennessee "heav[ily relied]" on its Form No. 567 data for the Project, however ETG does not produce any evidence for this contention other than an unsupported statement by its consultant. *Id.* at 7 (citing Ex. A, aff. of Richard Smead at 1).  The consultant's statement notes only that it requested the Form No. 567 because East Tennessee relied on flow patterns on its system, rather than asserting that East Tennessee or the Commission relied on Form No. 567 in evaluating the Project. Aff. of Richard Smead at 1 ("[G]iven ETNG's System Alignment's heavy reliance on changes in flow patterns on East Tennessee, on June 4, 2023, I requested a copy of East Tennessee's just-filed Form 567 System Flow Diagram….").

process or APA violations,[16] we need not resolve that issue here because ETG was provided with the Form No. 567 information that it requested. [17]

10.    Although Commission staff provided ETG with the requested CEII information on May 29, 2024, by late August ETG had not made any additional filing explaining whether or how it believed this data should bear upon the Commission's analysis for authorizing the Project.  Therefore, on August 28, 2024, Commission staff sent letters to both ETG and East Tennessee, allowing ETG 15 days to comment on the CEII information[18] and allowing East Tennessee an additional 15 days to file comments on ETG's response.[19]  In its response, ETG stated that it had not had actual access to the CEII information until August 16, 2024, and that it, therefore, did not have sufficient time to provide substantive comments on the Form 567 data and that Commission staff's information request at this point in the proceeding was inadequate and untimely.[20]

11.    On October 7, 2024, Commission staff again sent letters to ETG and East Tennessee, providing ETG 15 days to provide any analysis or discussion of the 2022

_____

[16] ETG cites incorrectly to the APA throughout its rehearing request (citing to 5 U.S.C. § 509 and 5 U.S.C. § 510), however it appears that ETG intended to rely on an excerpt from 5 U.S.C. § 558(c) that generally states that an agency must give "due regard for the rights and privileges of all the interested parties or adversely affected persons" when setting and completing proceedings for the issuance of a license, and the judicial review provisions in 5 U.S.C. § 706.  ETG does not cite any caselaw or provide any explanation for how these general provisions apply here.

[17] *See Minisink Res. For Env't Pres. & Safety v. FERC*, 762 F.3d 97, 115 (D.C. Cir. 2014) (holding that it was not a due process violation to withhold certain confidential documents where it was speculative as to whether they would support petitioners' position); *B&J Oil & Gas v. FERC*, 353 F.3d 71, 77-78 (D.C. Cir. 2004) (declining to remand in light of withheld confidential documents where the public record contained substantial evidence to uphold the Commission's decision); *NEXUS Gas Transmission, LLC*, 164 FERC ¶ 61,054, at P 20 (2018) (finding that the Commission did not violate the party's due process rights where the party was not harmed by failing to gain access to the materials and the public record was adequate to support the Commission's decision).

[18] August 28, 2024 Letter to the East Tennessee Group.

[19] August 28, 2024 Letter to East Tennessee Natural Gas, LLC.

[20] September 11, 2024 Response from the East Tennessee Group (September 11 ETG Response).  East Tennessee's response to the September 11 ETG Response addressed ETG's procedural arguments.  September 26, 2024 Response from East Tennessee Natural Gas, LLC.

Form 567 data[21] and East Tennessee an additional 15 days to respond to ETG's comments.[22]  In its response, ETG again argued that the Commission staff request is inappropriate at this stage of the proceeding and that it again has not had sufficient time to prepare a full response.[23]

12.    As explained above, ETG has now received the relief requested, including access to the relevant CEII information.[24]  Given that ETG's rehearing request was premised solely on its failure to receive the requested CEII, and that ETG has not taken advantage of multiple opportunities during the at least four months that it has had that information to provide its substantive arguments regarding the requested CEII information,[25] we continue to find that the Certificate Order was properly issued based on the record that was before the Commission.

---

[21] October 7, 2024 Letter to the East Tennessee Group.

[22] October 7, 2024 Letter to East Tennessee Natural Gas, LLC.

[23] October 21, 2024 Response from the East Tennessee Group (October 21 ETG Response).  In neither the September 11 ETG Response nor the October 21 ETG Response did ETG seek an extension of time to respond to the Commission staff requests.  In its second response, ETG again makes arguments questioning whether a predetermination of rolled-in rates was appropriate.  October 21 ETG Response at 3.  However, as explained above, ETG did not properly raise these issues in its rehearing request.  *See supra* note 14.  East Tennessee responded to ETG's procedural concerns. November 5, 2024 Response from East Tennessee Natural Gas, LLC.

[24] *See supra* note 14.

[25] We note that ETG has lodged its petition for review of the Certificate Order in the docket.  *See* ETG July 18, 2024 Filing (petition for review of the Certificate Order and Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration with the U.S. Court of Appeals for the District of Columbia Circuit). ETG's petition for review would be limited to the sole issue raised in ETG's rehearing request, which we address here in this order.  *See Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022) ("Our jurisdiction is also constrained by the Natural Gas Act.  And for this court to have statutory jurisdiction under that Act to consider an issue, the party seeking review must have presented the same issue to the Commission in an application for rehearing.  Parties seeking review of FERC orders must petition for rehearing of those orders and must themselves raise in that petition all of the objections urged on appeal.") (cleaned up).

The Commission orders:

      In response to ETG's rehearing request, the Certificate Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )


                                  Debbie-Anne A. Reese,
                                    Secretary.

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**


| | |
|---|---|
| **EAST TENNESSEE GROUP,** ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | |
| **FEDERAL ENERGY REGULATORY** ) | |
| **COMMISSION,** ) | |
| **Respondent.** ) | |


**CORPORATE DISCLOSURE STATEMENT**


The East Tennessee Group is a voluntary association of municipal utilities that
are not corporations, have no parent corporation, and do not issue stock.


Date: February 19, 2025


                                        */s/ Kelly A. Daly* _____
                                        Kelly A. Daly (DC Circuit Bar No. 40785)
                                        SNELL & WILMER
                                        2001 K. Street NW, Suite 425
                                        Washington, DC 20006
                                        kdaly@swlaw.com
                                        (202) 725-0605


                                        Attorney for the East Tennessee Group